[No. 14515.  Department Two.  May 10, 1918.]

THE STATE OF WASHINGTON, *on the Relation of
Albert M. Dearle et al., Respondent,* v.
C. R. FRAZIER, *as Superintendent of
School District No. 24 of Snohomish
County, et al., Appellants.*[1]

SCHOOLS AND SCHOOL DISTRICTS—"RELIGIOUS" INSTRUCTION. The giving of credits for Bible study done outside of school, furnishing an outline of study, conducting examinations, and the rating of papers, covering the "historical, biographical, narrative and literary features of the Bible," violates Const., art. 1, § 11, providing that no public money shall be applied to any religious worship, exercise or instruction.

Appeal from a judgment of the superior court for Snohomish county, Bell, J., entered June 26, 1917, in favor of the plaintiffs, upon overruling a demurrer to the complaint, in an action in mandamus. Reversed.

*Lloyd L. Black, Clifford Newton,* and *John Sandidge,* for appellants.

*Wm. A. Johnson,* for respondent.

CHADWICK, J.—This cause is one brought by the petitioners below, respondents on this appeal, to compel appellants, by writ of mandate, to give petitioners an examination in the course of Bible study and to compel appellants to give them high school credits for graduation for such Bible study.

"A large proportion of the early inhabitants of this country were driven from their native homes by religious persecution, and sought an asylum in a savage wilderness, preferring hardships, privations and danger rather than to submit to any interference with their right to worship Almighty God according to the dictates of their own consciences. To Massachusetts

[1]Reported in 173 Pac. 35.

came the Puritans; to Rhode Island, the Baptists; to the Carolinas, the Huguenots; to Maryland, the Catholics; to Pennsylvania, the Quakers; while other denominations established themselves in different localities where they could enjoy this inestimable privilege, either alone or in comity with other tolerant sects.

"It was, no doubt, with a full consideration of the heterogeneous elements composing our nation, and the memory of the persecutions of their ancestors, that the people of all the states adopted constitutional safeguards against religious intolerance, and all but two of the original thirteen states declared a complete divorce between the government and creed. . . .

"This growth of public sentiment has continued until the adoption of our own constitution, the provisions of which on this subject are as broad, if not broader and more positive and more comprehensive, than similar provisions in any of the other state constitutions.

"This growth does not, however, indicate a decrease in religious sentiment among the people; these provisions have not been the work of the enemies, but of the friends of religion. It is not that the men who framed and the people who adopted these constitutional enactments were wanting in reverence for the Bible, and respect and veneration for the sublime and pure morality taught therein, but because they were unwilling that any avenue should be left open for the invasion of the right of absolute freedom of conscience in religious affairs; because that they were unwilling that any man should be required, directly or indirectly, to contribute toward the promulgation of any religious creed, doctrine or sentiment to which his conscience did not lend full assent." 1 Opinions of the Attorney General, 142.

The provisions of our state constitution to which the *Attorney General* has attended, and which have a bearing upon our present discussion, are as follows:

"All schools maintained or supported wholly or in part by the public funds shall be forever free from sectarian control or influence." Const., art. 9, § 4.

"No public money or property shall be appropriated for or applied to any religious worship, exercise, or instruction, or the support of any religious establishment." Const., art. 1, § 11.

The question calling for the opinion of the Attorney General was:

"Can a teacher employed in the common schools of this state, without violating any law of the state or any provision of the state constitution, conduct devotional or religious exercises at the opening of the school day, or during any part of the school day as prescribed by law, by the singing of hymns or other sacred music, or by reading passages from the Bible, without comment, or by repeating or causing to be repeated, without comment, what is usually known as the Lord's Prayer?"

This opinion has ever been regarded as fair interpretation of the intent of the framers of our constitution and of the people who adopted it. It has been twice followed by succeeding Attorneys General. Opin. Atty. Gen. 1909-1910, p. 135; Opin. Atty. Gen. 1915-1916, p. 254. In the first instance, the query was:

"Has a teacher the legal right to open school each morning with a prayer?"

In the second instance, in answer to the query:

"May the directors of a school district prescribe a course of Bible study for high school students and grant school credits to apply toward graduation from such high schools to students who successfully pass examinations upon such course of Bible study, provided that such Bible study shall be optional and shall be pursued outside of the public school buildings, and that no part of the public school money, time or property be used in conducting such courses."

The Attorney General held that:

"The legal objection to the proposed system of Bible study is that the courses of study are made a part of the public school curriculum."

Many people sincerely believe that a cultivation of religious sentiment, which we may admit is essential to the development of an enlightened citizenship, should be a part of the education and training of the children of our country, and they as firmly believe that the version of the Bible, which is accepted and acknowledged by the great majority of the citizens of this country, should be made the vehicle of that development. They believe that the constitution can have no application unless an attempt is made to advance the doctrine of a particular denomination or to instil the dogma of sect in the mind of the pupil. Consequently it has been resolved by assemblies of teachers in this country and other countries that a course in Bible study should be a part of school work.

In 1915, the state board of education adopted the following resolution:

"Since the board looks with favor upon allowing credits for Bible study done outside of school, it is moved that a committee be appointed to consider a plan for allowing such credits, one-half credit to be given for Old Testament, and one-half credit for New Testament, on the basis of thirty to thirty-two credits for high school graduation, and that a syllabus of Bible study be issued under the auspices of the state department of education with rules and regulations for the distribution of examination questions at least once a year."

The plan thus outlined is in effect, so we are informed by counsel, in Spokane, Tacoma, Centralia, Sunnyside and Everett, from whence this case comes. To make the plan feasible and to avoid the rock of the constitution, as we may well presume, the school board adopted the following resolution:

"Resolved, By the board of education, Everett, Washington, that high school credit for Bible study may be allowed to the members of the Everett high

school to the extent of one credit on Old Testament scriptures and one credit on New Testament scriptures, under the following conditions:

"First—Credit shall be granted only after successfully passing an examination covering the historical, biographical, narrative and literary features of the Bible, and based upon an outline to be hereafter adopted by the board of education.

"Second—Supervision of instruction in Bible shall not be undertaken by the high school beyond the furnishing of a syllabus or outline and the setting of examination, rating of papers and determining of credit.

"Third—It is contemplated that all personal instruction and interpretation shall be given in the home or by the religious organizations with which the students are affiliated, following the outline furnished by the board of education.

"Fourth—Not more than one credit in Bible shall be allowed an individual in any one school year.

"Fifth—It is assumed that this work will require the equivalent of one 45 minute lesson per week through the school year and the equivalent of three hours per week in outside study."

Authority for this resolution is found by counsel in the resolution of the state board of education, and in the code.

"Every board of directors of a school district of the first class shall . . . have the power: Second, To prescribe a course of study and a program of exercises which shall not be inconsistent with the course of study prepared by the state board of education, for the use of the common schools of the state. . . . Fourth, To adopt and enforce such rules and regulations as may be deemed essential to the well-being of the schools, and to establish and maintain such credits and departments, including night, high, kindergarten, manual training and industrial schools, . . . as shall, in the judgment of the board, best promote the interests of education in that district." Rem. Code, § 4509.

Counsel for respondent bases his argument upon two propositions—

First: The resolution does not establish or maintain

any school system which is under sectarian control or influence.

Second: There is no expenditure of public funds for any religious worship, exercise or instruction, or for the aid or support of any religious establishment.

The first premise will be dismissed, not because it will not bear argument, for there is much argument and authority on either side, but because the case can be determined by reference to the second premise alone.

The framers of the constitution were not content to declare that our public schools should be kept free from sectarian control or influence; they went further and made it certain that their declaration should not be overcome by changing sentiments or opinions. They declared that "no public money or property shall ever be appropriated or applied to any religious worship, exercise or instruction," and in this respect our constitution differs from any other that has been called to our attention.

It has been held in several of the states that the reading of the Bible, or the ten commandments, or the recital of the Lord's Prayer, without comment or remark, does not violate a constitution providing that no person shall be compelled to attend or support any place of religious worship, or to pay taxes for the support of any minister of the Gospel or teacher of religion, or that no public moneys shall ever be used for sectarian purposes, or for the support of sectarian schools, or equivalent expressions. *Church v. Bullock,* 104 Tex. 1, 109 S. W. 115, 16 L. R. A. (N. S.) 860; *Pfeiffer v. Board of Education of Detroit,* 118 Mich. 560, 77 N. W. 250, 42 L. R. A. 536; *Billard v. Board of Education of Topeka,* 69 Kan. 53, 76 Pac. 422, 105 Am. St. 148, 66 L. R. A. 166; *Moore v. Monroe,* 64 Iowa 367, 20 N. W. 475, 52 Am. Rep. 444.

But these cases are based upon provisions that go no further than art. 9, § 4, of our constitution. Their purpose is to prevent the teaching of any of the beliefs, creeds, doctrines, opinions, or dogmas of any sect, and to prevent the appropriation of money for parochial and denominational schools, a privilege that had been abused by the legislatures of some of the states, and of which the people were no doubt mindful at the time our constitution was adopted. In the light of other constitutions, the abuses in other states, and the evident purpose of the framers of the constitution to save some of the questions which had there arisen, there can be no doubt that more was intended than a simple declaration that our schools should be kept free of sectarian influences. Article 1, § 11, is all significant. The words ''No public money shall be appropriated for or applied to any religious worship, exercise, or instruction'' are sweeping and comprehensive.

Our inquiry may be limited, then, to the one question, whether an examination of pupils upon ''the historical, biographical, narrative, and literary features'' of the Bible is religious instruction within the meaning of the constitution. To meet the premise of counsel for respondent, we would have to read the prohibition as if it were ''No public money shall be applied to any *denominational* or *sectarian* worship, exercise, or instruction,'' and reject the broader term ''religious;'' for his argument proceeds as if the sole object of the constitution was to keep the schools free of sectarian influences. While selections such as the Lord's Prayer, the Twenty-third Psalm, and the Sermon on the Mount are regarded as masterpieces of literature and inspiringly grateful to a thirsty soul, they are calculated to invite or excite the youthful mind to inquiry and the elder to resentment, for some, the Jew for instance, while accepting the Twenty-third Psalm, might reject

the Lord's Prayer and the Sermon on the Mount as the work and words of one whom he regards as an impostor. Then, too, the Twenty-third Psalm, as we understand it, is not the Twenty-third Psalm in the Douay Bible, but the twenty-second. Neither is the translation the same as in our own Bible. Nor is the Lord's Prayer translated in the same way. These objections, to many of us, would seem light and trivial, but history has been made over the controversies that have arisen out of such as these, and that such innocent uses of the Bible has lead to civil strife and discussion is abundantly proved by the cases to which we have referred.

We have, then, not only "religious exercises" and "instruction" which is prohibited, but their natural consequence—religious discussion and controversy. The most ready and popular argument for the avoidance of these constitutional provisions has been that, whereas the Bible inculcates a code of morality which, if understood and practiced, will make for better citizenship, and whereas it is essential that the youth should be impressed with an understanding of the fundamental principles of right and wrong and thus grow in moral stature, Bible instruction by reading selected passages without comment can do no violence to the constitution, no hurt to the principle of divorcement of church and state, and that it should be, therefore, not only tolerated, but encouraged. *Hackett v. Brooksville Graded School District,* 120 Ky. 608, 87 S. W. 792, 117 Am. St. 599, 69 L. R. A. 592.

It is upon this case and those cited above that counsel relies, and as paradoxical as it may seem, our best authority for rejecting the doctrines announced is to be found in the cases themselves. Quickly put, they distinguish religion in its broader sense from the dogmas, creeds or opinions of sect, and hold that, although the Bible may be the text-book of every sect, yet in its

history, narrative, biography and its moral persuasions, it serves no sect, but, on the contrary, is a spiritual stimulant in every individual, whether he be a Jew or a Gentile, a Catholic or a Protestant, a Moslem or a Buddhist, a Christian or a Pagan, a believer or an atheist. That the study of the Bible for its historical, narrative, biographical, or literary features serves the religious impulse and the ends of those who would aid the growth of religion as distinguished from mere sect is acknowledged.

"Every pupil who enters a public school has a right to expect, and the public has a right to demand, of the teacher that such pupil shall come out with a more acute sense of right and wrong, higher ideals of life, a more independent and manly character, a higher conception of his duty as a citizen, and a more laudable ambition in life, than when he entered. The system ought to be so maintained as to make this certain. The noblest ideals of moral character are found in the Bible. To emulate these is the supreme conception of citizenship. It could not, therefore, have been the intention of the framers of the constitution to impose the duty upon the legislature of establishing a system of common schools where morals were to be inculcated and exclude therefrom the lives of those persons who possessed the highest moral attainments." *Billard v. Board of Education of Topeka, supra.*

It will thus be seen that the cases cited were dealing only with the question whether the reading or study of the Bible might be a sectarian influence, and not with the question whether such reading or study was religious instruction. To prove that it is not sectarian instruction, they affirm that it is no more than religious or moral instruction; and so affirming, logically hold that, if their constitutions had been such as ours, they would have held to the contrary.

But it is said that the teaching is to be upon the historical, biographical, narrative, and literary fea-

tures of the Bible only, and in this the instruction will be neither sectarian, doctrinal, denominational nor religious. This might be true if all citizens were agreed that the King James' translation of the Bible is a true version of the scriptures, and then only if the teaching were under the control of those who are selected through the means and methods provided by law. But the vice of the present plan is that school credit is to be given for instruction at the hands of sectarian agents. Then, too, all citizens are not agreed as to the narrative and historical worth of the Bible. It is true that some of the events there recorded have shaped the destinies of millions of people, yet they are not mentioned in profane cotemporaneous history. Some are not agreed whether many of the events there narrated are historical or allegorical; whether the earth was created in six days; where Cain obtained his wife; whether the whole earth was covered with a flood of waters; whether Jonah was swallowed by a whale; whether Elijah was translated by a whirlwind into heaven; whether Lot's wife was turned into a pillar of salt; whether our God stopped the sun in its course that Joshua might overcome his enemies; whether he made the waters of the sea to recede that his chosen people might pass to the promised land; whether God spake with the prophets, or ordered the lives of such great rulers as David and Solomon; are questions all sounding in narrative and history that have excited differences and controversies that are never settled.

That Bible history, narrative, and biography cannot be taught without leading to opinion, and ofttimes partisan opinion, is understood and anticipated by the school board. They admit, as plainly as language can admit, that Bible teaching does lead to sectarian opinion and differences of opinion upon religious questions. They employ the word "religious" in a narrow and

sectarian sense. They speak of "religious organizations" and provide that "interpretation" shall be given in the home, or by some "religious organization."

Now we had thought that "history, biography and biblical narrative" would require no interpretation—certainly no interpretation calling for the doctrinal opinion of a religious organization. And who of authority in our schools is to say that a pupil shall, or shall not, have credit if he answers questions in a way that is different from the way intended by those who prepared the course of instruction. It may be said that the pupil is entitled to credit if he answers in a way that is consistent with the faith of his instructor. But there are two objections to this. The one is that the examiner may not know the faith and teachings of those of a different faith; the other and more conclusive objection is that, to give a credit in the public school for such instruction, is to give a credit for sectarian teaching and influence, which is the very thing outlawed by the constitution.

"Courts have been zealous in protecting the money set apart for the maintenance of the free schools of the country. They have turned a deaf ear to every enticement and frowned upon every attempt, however subtle, to evade the constitution. Promised benefit and greater gain have been alike urged as reasons, but without avail." *School District No. 20 v. Bryan,* 51 Wash. 498, 99 Pac. 28, 20 L. R. A. (N. S.) 1033.

In that case it was sought to justify the expenditure of school money for the instruction of children outside the public schools. The logic of our opinion is that instruction upon all subjects proper for the advancement or credit of a pupil should be given within, and not without, the schools, or, at least, under the immediate tuition of a teacher who has qualified to teach under the laws of this state.

The plan for the education of our youth as outlined by the legislature indicates that it had no intention of ever providing credit for work done under the tuition of any one who had not been licensed to teach by the school authorities.

"No teacher shall be accounted as a qualified teacher . . . who is not the holder of a valid teacher's certificate, or diploma issued by lawful authority of this state." Rem. Code, § 4543.

The law provides, Rem. Code, § 4550, that it shall be the duty of the teacher to impress upon the minds of the pupils morality, truth, etc. It would seem that the legislature would have declared in words that the Bible should be regarded as a text-book, and that credits could be given for study outside the school and under those not holding either teacher's certificate or diploma, if it had so intended.

It is no more than a subterfuge to urge that the public moneys will not be applied for religious instruction because the teaching is done outside the school by a preacher or priest, or in the home of the pupil, or by a religious organization with which the student may be affiliated, for the time of the teachers, as well as their technical skill, will be consumed while under the pay of the state in furnishing the syllabus or outline, the conducting of examinations, the rating of papers, and the determining of proper credits.

There are many cases in the books upon the questions herein discussed, but none of them have reference to a constitutional provision exactly like our own. They are collected in the several series of selected cases. *Pfeiffer v. Board of Education of Detroit,* 42 L. R. A. 536; *Church v. Bullock,* 16 L. R. A. (N. S.) 860; *State ex rel. Weiss v. District Board of School District No. 8,* 7 L. R. A. 330; *County of Cook v. Industrial School for Girls,* 8 Am. St. 386, 414; *People ex*

*rel. Ring v. Board of Education,* 19 Ann. Cas. 220; 35 Cyc. 1127.

. The following cases, however, support our views: *State ex rel. Weiss v. District Board of School District No. 8,* 76 Wis. 177, 44 N. W. 967, 20 Am. St. 41, 7 L. R. A. 330; *People ex rel. Ring v. Board of Education of District 24,* 245 Ill. 334, 92 N. E. 251, 19 Ann. Cas. 220, 29 L. R. A. (N. S.) 442.

We shall not go far afield when we suggest that it is a matter within the common knowledge of those who followed the discussion attending the framing of our constitution that it was the purpose of the men of that time to avoid all of the evils of religious controversies, the diversion of school funds to denominational schools and institutions, and the litigation that had occurred in other states. For it was known that religious opinion is a thing that men will fight for, and sometimes in most insidious ways. The question then was—and the people who adopted the constitution were so advised —whether we should adopt a constitution which provided in terms that no religious instruction should ever be a part, directly or indirectly, of the curriculum of our schools.

To compromise opinion in these matters is to lead to confusion which would make the courts the arbiter of what is and what is not religious worship, instruction, or influence, which would be as intolerable to the citizen as it would be to leave a decision to a school board. To this end the supreme court of Iowa had lead the law, as witness their halting after declaring that their constitution did not interdict Bible reading. They say, "It is perhaps not to be denied that the principle carried to extreme logical results might be sufficient to sustain the appellant's position," which means no more than this—the courts will say how far you may go in matters of this kind, whereas, if the right or prohibi-

tion be in the constitution, there is no middle ground, no twilight zone for the courts to explore. It is either a right, or a prohibition. Then, too, witness the illogic of the Kentucky court in *Hackett v. Brooksville Graded School District*, 120 Ky. 608, 87 S. W. 792, 117 Am. St. 599, 69 L. R. A. 592. It says: "The Book [meaning the Bible] to the sectarian, must show that it teaches the peculiar dogmas of a sect as such, and not alone that it is so comprehensive as to include them by the partial interpretation of its adherents." Notwithstanding it is known of all men that the rock upon which the religious opinions of men have split is the "word," and that every sect is able to sustain itself, at least to its own satisfaction, by reference to the literal word of the Bible. It is the other sect that is the victim of partial interpretation.

In disregard of the deeper reasons which prompted the people to take some security against the breeding of religious controversies in schools supported by the public school funds—reasons adverted to in many of the decisions—some courts, as it seems to the writer of this opinion, have inclined to the letter rather than to the spirit of the constitution. To illustrate, the supreme court of Nebraska held their constitution, providing that: "No sectarian instruction shall be allowed in any school or institution supported in whole or in part by the public funds set apart for educational purposes," forbade the reading of passages from King James version of the Bible, the singing of religious songs, and songs sung in "Orthodox Evangelical Churches," and the offering of prayer in accordance with the customs or usages of sectarian churches or religious organizations. On rehearing, evidence was quoted to show that the first opinion of the court was well founded upon the facts of the case at hand. The court met the vigorous assault made upon the first

opinion by declaring that ''the decision does not however exclude the Bible from the public schools. It goes to the exent of denying the right to use it for the purpose of imparting sectarian instruction,'' and to quote from the syllabus prepared by the writer of the opinion on rehearing:

''The courts have no right to declare its use to be unlawful because it is possible or probable that those who are privileged to use it will misuse the privilege by attempting to propagate their own peculiar theological or ecclesiastical views and opinions.  .  .  .

''Whether it is prudent or politic to permit Bible reading in the public schools is a question for the school authorities, but whether the practice of Bible reading has taken the form of sectarian instruction is a question for the courts to determine upon evidence.

''It will not be presumed in any case that the law has been violated; every alleged violation must be established by competent proof.'' *State ex rel. Freeman v. Scheve,* 65 Neb. 853, 877, 91 N. W. 846, 93 N. W. 169, 59 L. R. A. 927.

There is another reason for our holding which is not suggested in the briefs, but it nevertheless seems forceful to the writer. It is, that neither the board of education nor the school board has undertaken to define the meaning of the word Bible. It may be said that they did not have the Jewish Bible in mind, for credit is provided for instruction and examination in the New Testament, but we apprehend that this would not be binding on a Jewish school board. It would be free to prescribe the Talmud. A school board made up of Protestants would have in mind and provide for instruction and examination in the King James' version. A board made up of Catholics would, no doubt, insist upon the use of the Douay Bible, while a board made up of Lutherans would hold the pupil to the translations of Luther.

"For more than three centuries it has been the boast and exultation of the Protestants and a complaint and grievance of the Roman Catholics that the various translations of the Bible, especially of the new Testament, into the vernacular of different peoples, have been the chief controversial weapons of the former and the principal cause of the undoing of the latter. For making such translations Wyclif, Luther, Tyndale, and others have been commended and glorified by one party, and denounced and anathematized by the other. Books containing such translations have been committed to the flames as heretical, and their translators, printers, publishers, and distributors persecuted, imprisoned, tortured, and put to death for participating in their production and distribution. The several popular versions differ in some particulars from each other, and all differ from the Catholic canon, both in rendition of passages from which sectarian doctrine are derived by construction and in the number of books or gospels constituting what is regarded as the written record of Divine revelation. In addition to this, there are persons who are convinced, upon grounds satisfactory to them, that considerable parts of the writings accepted by all Protestant denominations are not authentic, while devout Hebrews maintain that the New Testament itself is not entitled to a place in the true Bible." *State ex rel. Freeman v. Scheve,* 65 Neb. 853, 91 N. W. 846, 93 N. W. 169, 59 L. R. A. 927.

And it is not beyond the realm of imagination to believe that the framers of our constitution foresaw the possibility of a school board divided in its religious beliefs.

Another reason which strengthens our opinion is that the people amended art. 1, § 11, at the general election in 1904, by adding the words "provided, however, that this article shall not be so construed as to forbid the employment by the state of a chaplain for the state penitentiary, and for such of the state reformatories as in the discretion of the legislature may seem justified." We regret that we have not been able

to find the history of this amendment, but the time we are able to give to this opinion will not admit of further search. It would seem, however, that the people were satisfied with the construction given the article by the *Attorney General*. The proviso makes specific provision, and a rule of interpretation that excludes a like interpretation of the other parts of the article.

The resolution provides that the syllabus or course of study is to be made up by the school board. What guarantee has the citizen that the board, having a contrary faith, will not inject those passages upon which their own sect rests its claim to be the true church under the guise of "narrative or literary features;" and if they did so, where would the remedy be found? Surely the courts could not control their discretion, for judges are made of the same stuff as other men, and what would appear to be heretical or doctrinal to one may stand out as a literary gem or as inoffensive narrative to another, and thus the evil at which the constitution is aimed would break out with its ancient vigor. If the sentiment of the people has so far changed as to demand the things sought to be done, the remedy is by amendment to the constitution.

Being controlled in our judgment by our conception of the constitution, we are constrained to reverse the judgment of the court below and to remand the case with directions to deny the writ.

ELLIS, C. J., FULLERTON, and MOUNT, JJ., concur.

HOLCOMB, J. (concurring)—I do not agree with, and see no need of, many of the observations and much of the controversial discussion contained in the prevailing opinion.

The state constitution, art. 1, § 11, contains the specific and positive inhibition:

13—102 WASH.

"No public money or property shall be appropriated for or applied to any religious worship, *exercise, or instruction.*"

That is plain, simple and mandatory, and by it the legislature, school authorities and courts are bound. The school authorities are forbidden to apply any of the public money or property to any religious exercise or instruction. The curricula of the public educational institutions cannot be made to include any kind of religious worship, *exercise, or instruction.* The language is most comprehensive and argues itself.

For that sole and sufficient reason, I am bound to, and do, concur in the result.