[No. 39226.    En Banc.    December 28, 1967.]

CALVARY BIBLE PRESBYTERIAN CHURCH OF SEATTLE *et al.,*
*Appellants,* v. BOARD OF REGENTS OF THE UNIVERSITY
OF WASHINGTON, *Respondent.**

*Reported in 436 P.2d 189.

*Cartano, Botzer & Chapman* and *Douglas J. Smith,* for appellants.

*The Attorney General* and *James B. Wilson, Assistant,* for respondent.

*Henry T. Ivers* (of *Lenihan & Ivers*), amicus curiae.

WEAVER, J.—Since 1919, the Department of English of the University of Washington, a state tax-supported university, has offered an elective course of study presently designated "English 390: The Bible as Literature."

Two churches, incorporated organizations, and their respective ministers commenced this action against the Board of Regents of the University of Washington praying (1) for an injunction pendente lite directing the defendants to

discontinue "the prescribed course[1] until such time as the matter may be fully considered by the Court;" and (2) for a "permanent injunction . . . restraining the Board of Regents from authorizing any course of instruction dealing with the historical, biographical, narrative or literary features of the Bible."

Plaintiffs contend that the teaching of English 390 is violative of article 1, section 11 and article 9, section 4 of the Washington State Constitution, which provide:

No public money or property shall be appropriated for or applied to any religious worship, exercise or instruction, . . . . (Const. art. 1, § 11)
All schools maintained or supported wholly or in part by the public funds shall be forever free from sectarian control or influence. (Const. art. 9, § 4)

Plaintiffs also contend that the teaching of English 390 violates the first amendment to the United States Constitution ("Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; . . .") as applied to the states through the Fourteenth Amendment.

Although the constitutional violations are urged, the major premise of plaintiffs' argument, as alleged in their amended complaint, is:

That the manner in which said presentation is made [of English 390] is contrary to the religious beliefs of Plaintiffs, both individually and as church organizations and congregations. That said manner of presentation is in itself the presentation of a religious point of view, being one of several theological positions within the Protestant faith.

After hearing upon plaintiffs' motion for a temporary injunction and defendant's motion to dismiss the complaint, the trial court:

1. Denied plaintiffs' motion for a temporary injunction and authorized defendant "to grant such credits as are ordinarily granted to those students in said course who successfully complete it, . . ." pending final decision;

---

[1]The course is not prescribed; it is an elective.

2. Dismissed the two churches as parties plaintiff "on the ground that said plaintiffs have no standing to sue as taxpayers;"

3. Refused to dismiss the two ministers as parties plaintiff for they "have standing to sue as taxpayers without further showing of interest;"

4. Determined the guidelines for the trial of the issues by ordering

> that the issues of fact upon which the plaintiffs have the burden of proof is whether English 390 as taught at the University of Washington by Professor Fowler, or any other instructor at the University, is slanted in a religious direction, or designed to induce a particular religious belief, or to advance particular religious interests, or whether the course amounts to religious indoctrination by teaching from a fixed theological position to promote a particular theology; . . . .

It is apparent at once that plaintiffs' major premise does not meet directly the guidelines laid down by the trial court. Basically, the question before the trial court was factual. The problem is one of the purpose and character of the teaching.

The trial court found: that English 390 concerns itself with the literary features of the Bible and, as a necessary part thereof, the history of ancient Israel; the authorship and treatment of the various books of the Bible, and their interpretation from a literary and an historical point of view, employing the same techniques of scholarship used in the study of any other literary or historical text; that the course is offered as part of a secular program of education to advance the knowledge of students and the learning of mankind; that it is taught by members of the English department who are competent literary scholars, qualified to teach in their respective fields of specialization. The course is not taught by theologians. One professor uses the Revised Standard Version of the Bible; another the Oxford Annotated Edition of the Revised Standard Version; a third, the King James version. Each makes his choice of the English translation for his own professional reasons.

Further, the court found that English 390 is taught as a study of the Bible for its literary and historic qualities and is presented objectively as a part of a secular program of education.

Finally, the court found that the course:

does not promote a particular theology for purposes of religious indoctrination, nor is it slanted in a religious direction, nor does it induce any particular religious belief, nor does it advance any particular religious interests or theology.

. . . .

There is no evidence that English 390, as taught at the University of Washington, is intended to affect the religious beliefs of students taking the course or indoctrinate them in any particular religious belief, or that it has had that effect.

The trial court dismissed plaintiffs' complaint with prejudice.

Plaintiffs' 15 assignments of error may be grouped into three categories. The *first* contains assignments of a technical nature usually made to insure that everything is before the appellate court. The assignments of error in the *second* category are directed to the trial court's dismissal of the two churches as parties plaintiff. The *third* group of assignments involves the trial court's refusal to adopt plaintiffs' proposed findings of fact and conclusions of law and its adoption of those proposed by the defendants.

The first category of plaintiffs' assignments of error need not be discussed.

The second — the dismissal of the two churches as parties plaintiff because they are not taxpayers and have no "standing" to raise the questions involved — presents a problem that is as much a question of political science as it is of law.

■ The traditional approach is that a taxpayer must show that he has a unique right or interest that is being violated, in a manner special and different from the rights of other taxpayers, before he may maintain an action against the state or one of its agencies, to test the constitu-

tionality of a statute or an administrative policy. It is not the province of the court to delve into the policy judgments of other branches of government. On the other hand, the court does have a responsibility to protect the legislative and executive branches of government from legal actions of harassment by those who do not have rights affected; and to protect the public from the possibility that judicially-developed law may become the product of friendly suits in which both parties seek to establish the same principle, to the detriment of others whose rights will be controlled by the precedent established.

■ It would be unrealistic to say that this court has always been consistent in its determination of those who had "standing" to maintain an action to test the constitutionality of a statute or of an administrative ruling or practice.[2] In a plethora of decisions between *Jones v. Reed,* 3 Wash. 57, 27 Pac. 1067 (1891), and *Fransen v. Board of Natural Resources,* 66 Wn.2d 672, 404 P.2d 432 (1965), a variety of conclusions have been reached. Some of the distinctions the court has drawn are shadowy and inconclusive.

In one field, however, it is rather certain that the plaintiff must at least be a taxpayer. Plaintiff churches cite only one case in support of their contention that they should not have been dismissed from the case — *Perry v. School Dist. No. 81,* 54 Wn.2d 886, 344 P.2d 1036 (1959) (released-time from school for religious instruction). Factually, it appears that several religious organizations were granted permission to file complaints in intervention in the *Perry* case. The decision, however, does not discuss the "standing" of the plaintiffs in intervention, and we do not consider the case authority for the position of the plaintiffs in this case.

Since the trial court found that appellant churches were not taxpayers, it was not error to dismiss them from this case.

---

[2]See Peck: *Standing Requirements for Obtaining Review of Governmental Action in Washington,* 35 Wash. L. Rev. 362 (1960).

Defendant-respondent makes a passing reference to the alleged error of the trial court when it permitted the two tax-paying ministers to remain as parties plaintiff.

■ In *Fransen, supra,* this court cited *Reiter v. Wallgren,* 28 Wn.2d 872, 184 P.2d 571 (1947); *State ex rel. Lemon v. Langlie,* 45 Wn.2d 82, 273 P.2d 464 (1954), and *State ex rel. Tattersall v. Yelle,* 52 Wn.2d 856, 329 P.2d 841 (1958). The court therein permitted a taxpayer to maintain an action, saying:

> The defendants maintain that, if taxpayers are allowed to bring injunction actions against public officers, the administration of public affairs will be unduly hampered. They have not brought to our attention a case illustrative of this evil, and certainly the instant action is not an example of unwarranted harassment.
>
> Inasmuch as it has not been demonstrated to the court that such taxpayers' suits result in more harm than good, we will not, on this occasion, overturn the rule allowing them. 66 Wn.2d at 677

We believe *Fransen, supra,* dispositive of the instant problem.[3]

Finally, we come to the third category of plaintiffs' assignments of error — the failure of the trial court to adopt their proposed findings of fact and conclusions of law and the entry of those based upon defendant's position.

■ On many occasions, this court has considered such assignments of error simply as an invitation for us to retry the case upon the written record and second-guess the trial court. This we have refused to do. Although admittedly based upon conflicting testimony, we find that there is sub-

---

[3]Under the present status of our decisional law, it is the *personal* opinion of the author of this decision that what is permissible or proper involves some policy judgment on the part of the court. If the action does not hamper the operation of government pendente lite, or *harass the state* or an agency thereof, and does involve a question of grave public importance, it should be considered by the court. This conclusion is somewhat shaken by an article entitled, "Ministers Seek to Oust U. W. Prof," appearing on page 69 of the November 9, 1967, Seattle Times. One of the ministers named is a plaintiff in the present action. The article reports that he seeks the ouster of an assistant professor of anthropology.

stantial evidence to support the findings of fact entered by the trial court. We accept them as verities.

The sole question remaining is whether the conclusions of law, based upon the findings, are violative of the constitutional provisions quoted *supra*.

■ The touchstone of the problem is the meaning attributed to "religious . . . instruction," as used in article 1, section 11 of our constitution. It must be kept in mind that the words appear after two more specific terms: "worship" and "exercise." This, we believe, is an indication that the framers of our constitution did not intend the word "instruction" to be construed without limit, but that the proscribed field be confined to that category of instruction that resembles worship and manifests a devotion to religion and religious principles in thought, feeling, belief, and conduct, *i.e.*, instruction that is devotional in nature and designed to induce faith and belief in the student.

■ There can be no doubt that our constitutional bars are absolute against *religious* instruction and indoctrination in specific religious beliefs or dogma; but they do not proscribe open, free, critical, and scholarly examination of the literature, experiences, and knowledge of mankind. If they did, many fields of scholarship — anthropology, zoology, the theory of evolution, astronomy, the germ theory of disease and medical cure, to mention only a few — would have to be removed from our university. It might be said that the objective examination of these theories conflicts with the religious beliefs of certain persons entertaining contrary beliefs based upon their religious convictions. This would, indeed, be true "sectarian control or influence," which is prohibited by article 9, section 4 of our constitution. It would, as Mr. Justice Brennan said so recently,

> cast a pall of orthodoxy over the classroom. *Keyishian v. Board of Regents,* 385 U.S. 589, 17 L. Ed. 2d 629, 87 Sup. Ct. 675 (1967).

The result advocated by plaintiffs would be catastrophic in the field of higher education. Would plaintiffs have us strike the works of Milton, Dante, and the other ancient

authors whose writings have survived the ages, because they wrote of religious theories with which plaintiffs quarrel? Our constitution does not guarantee sectarian control of our educational system.

In *Illinois ex rel. McCollum v. Board of Education,* 333 U.S. 203, 92 L. Ed. 649, 68 Sup. Ct. 461 (1948), Mr. Justice Jackson, in a concurring opinion, pointed out that:

> Music without sacred music, architecture minus the cathedral, or painting without the scriptural themes would be eccentric and incomplete, even from a secular point of view. . . . Even such a "science" as biology raises the issue between evolution and creation as an explanation of our presence on this planet. Certainly a course in English literature that omitted the Bible and other powerful uses of our mother tongue for religious ends would be pretty barren.

In the final analysis, plaintiffs contend: (1) That the Bible *cannot* be taught objectively as a course in literature, for the attempt to do so violates their personal beliefs (sectarian); hence, the teaching is unconstitutional; (2) That the course is *not* taught objectively, but is slanted against plaintiffs' beliefs.

It is apparent that the two contentions overlap factually. The case was well presented to the court, although the evidence of the parties splashes over the guidelines set by the trial court, established both by pretrial order and at the commencement of the trial.

The testimony is fascinating reading for one interested in the subject. Competent scholars, educators, professors, ministers, theologians, and students who had taken the course testified. It would unduly extend this opinion to analyze the testimony of any group of witnesses, except, perhaps, to mention the testimony of the students.

There is competent testimony to support the trial court's conclusion that "English 390—The Bible as Literature" *can* be taught objectively in a course in literature, without religious implications, for the court found that the course does not promote a particular theology for purposes of religious indoctrination; that it is not slanted in a religious

direction; that it does not induce any particular religious belief; and that it does not advance any particular religious interest or theology.

Not only is this conclusion justified by the oral testimony of experts, but it is supported by authorities upon the subject. They are set forth in the margin.[4]

Experts may talk in the abstract, but the "proof of the pudding is in the eating." Besides the experts, the following students who had taken English 390 testified: one who had no personal religious beliefs; a Catholic with a parochial school education; one who described herself as "a rather devout Methodist"; one a Christian Scientist; one a member of a Jewish synagogue (an outstanding student and the University's nominee as a Rhodes scholar).

Telescoping their testimony, we find that English 390 was taught in a completely objective manner; had no effect on religious beliefs; was not slanted toward any particular theological or religious point of view; did not indoctrinate anyone; did not enter into the realm of belief or faith; and was not taught from a religious point of view.

This, we believe, is sufficient to support the trial court's findings and to justify its conclusion that "English 390— The Bible as Literature," as taught at the University of Washington, is not violative of the constitutional provisions we have identified.

Plaintiffs place great reliance upon *State ex rel. Dearle v. Frazier,* 102 Wash. 369, 173 Pac. 35, L.R.A. 1918F, 1056 (1918) (a departmental opinion). The case is not apposite for two reasons: first, the facts are entirely different; and second, a judge concurring in the result pointed out that he saw "no need of many of the observations and much of the

---

[4]Katz, Religion and American Constitutions, 52, 53 (1963); Kauper, Religion and the Constitution, 98, 99 (1964); Pfeffer, Church, State, and Freedom 309 (1953); Black, Religion, "Standing," and the Supreme Court's Role, 13 J. Pub. Law 459, 466 (1964); Casad, *On Teaching Religion at the State University,* 12 Kans. L. Rev. 405, 411, 412 (1964); Katz, *Freedom of Religion and State Neutrality,* 20 U. Chi. L. Rev. 426, 431 (1953); Kauper, *Church and State: Cooperative Separatism,* 60 Mich. L. Rev. 1, 31 (1961); Michaelsen, The Supreme Court and Religion in Public Higher Education, 13 J. Pub. Law 342, 346 (1964).

controversial discussion" contained in the opinion. (It is not often the court points out its own dictum.)

*Dearle* was an action of mandamus to force the school board to give the petitioner an examination in the course of Bible study and to give high school credits for graduation therefor. Clearly, the program set up by the state board of education and the local school board violated our constitutional prohibitions.

Recently, the Supreme Court in *Whitehill v. Elkins,* 389 U.S. 54, 19 L. Ed. 2d 228, 88 Sup. Ct. 184 (1967), quoted with approval from *Sweezy v. New Hampshire,* 354 U.S. 234, 250, 1 L. Ed. 2d 1311, 77 Sup. Ct. 1203 (1957). Although the facts are different, the language has a bearing upon the problem before us. The court said:

"The essentiality of freedom in the community of American universities is almost self-evident. No one should underestimate the vital role in a democracy that is played by those who guide and train our youth. To impose any strait-jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation. No field of education is so thoroughly comprehended by man that new discoveries cannot yet be made. *Particularly is that true in the social sciences, where few, if any, principles are accepted as absolutes.* Scholarship cannot flourish in an atmosphere of suspicion and distrust. Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." (Italics ours.)

The judgment is affirmed.

FINLEY, C. J., HILL, DONWORTH, HAMILTON and HALE, JJ., and DENNEY and JAMES, JJ., Pro Tem., concur.[5]

HUNTER, J. (dissenting) — I dissent. The main thrust of the majority opinion is that English 390 as taught at the University of Washington does not contravene our state constitutional prohibition against religious instruction in public schools, article 1, section 11 and article 9, section 4;

[5]Rosellini and Neill, JJ., disqualified themselves from participating in the hearing and disposition of this appeal.

because it is a purely objective historical and literary study of the Bible, and is not motivated by the purpose of religious indoctrination or inducement of any religious belief. Regardless of how well intended the course may be, the record compels me to conclude that it is religious instruction and constitutes a direct attack upon the religious belief of many taxpayers of this state, who profess that the Bible is the "Revealed Word of God." This religious instruction and religious controversy in public schools is interdicted by our state constitution, *supra*.

The witnesses for both the appellants and respondents testified that within Christendom today there are two opposing religious views: (1) the traditional view that the Bible is the "Revealed Word of God," and (2) the liberal view that man is free to judge the genuineness and authority of the Bible. There can be no question from this record that the more liberal view is a part of the study for this course.

The outline written by Professor Fowler, as a study guide for the course, sets forth asserted facts inconsistent with Moses being the author of The Pentateuch; Isaiah as author of The Book of Isaiah; Daniel as author of The Book of Daniel; Paul, the Apostle, as author of The Pastoral Epistles; Peter as author of First Peter and Second Peter; and David as author of Psalms. It is conceded that the authorship of these books of the Bible is a matter of religious controversy.

The record, however, goes further. Dr. Wright, one of the instructors in the course, admitted that much of the factual material presented in the study outline was representative of the particular view of the Bible, held by Professor Fowler and himself, and also referred to as the Graf-Wellhausen hypothesis, the documentary hypothesis view, and the modernist view. Professor Fowler admitted his ideology was of the liberal view. Professor Irmscher, one of the instructors in English 390, admitted he instructed the students that the story of Adam and Eve in the Bible is a myth.

The following testimony of a student in the course further demonstrates the liberal point of view of the instructors:

> Q. (by Mr. Smith) Did you have the impression that the course was slanted in a religious way? A. Yes, I did. Q. Could you state in what way? . . . A. It was slanted toward the liberal views of theology, specifically higher criticism, variously known, I believe, as documentary hypothesis.
>
> Also there was a certain amount of *making characters in the early parts of Genesis as myths, which would be the mythologizing of the scriptures.*
>
> *And he also felt that Paul in the New Testament was the one that emphasized and pushed the New Testament church; rather than using the teachings of Jesus, that Paul himself was the one that was the genius of the New Testament Church.* (Italics mine.)

This direct attack on the integrity of the Bible unquestionably arouses deep resentment among those who adhere to the traditional view, and who are denied in this instance the assurance under our state constitution, article 1, section 11 and article 9, section 4, that their tax monies will never be used to support religious instruction.

The majority's holding that historical and literary study of the Bible, without the purpose of indoctrination in a specific religious belief, dogma, or creed, does not constitute religious instruction under our constitution, article 1, section 11, is not supported by authority in this state. To the contrary, in *State ex rel. Dearle v. Frazier,* 102 Wash. 369, 173 Pac. 35 (1918), we specifically held that any religious instruction is objectionable under our state constitution, even though it be neither sectarian, doctrinal, or denominational. We held there, that limited religious instruction, which involved state support only to the extent of furnishing an outline of study, conducting examinations and the grading of papers covering only the *historical, biographical, narrative and literary features of the Bible,* violates article 1, section 11 of our state constitution, as amounting to the application of public funds to religious instruction. This

limited purpose "instruction" was found unconstitutional even though actual "instruction" did not occur in the public schools, but was designed to be pursued at home or under the guidance of any church organization of the student's choice.

In this landmark case, speaking through Mr. Justice Chadwick, we stated at 375:

> In the light of other constitutions, the abuses in other states, and the evident purpose of the framers of the constitution to save some of the questions which had there arisen, *there can be no doubt that more was intended than a simple declaration that our schools should be kept free of sectarian influences.* Article 1, § 11, is all significant. The words "No public money shall be appropriated for or applied to any *religious* worship, exercise, or *instruction" are sweeping and comprehensive.*

> Our inquiry may be limited, then, to the one question, whether an examination of pupils upon *"the historical, biographical, narrative, and literary features"* of the Bible is religious instruction within the meaning of the constitution. To meet the premise of counsel for respondent, we would have to read the prohibition as if it were "No public money shall be applied to any *denominational or sectarian* worship, exercise, or instruction," and reject the broader term "religious;" *for his argument proceeds as if the sole object of the constitution was to keep the schools free of sectarian influences.* (Italics mine.)

We further stated at 377, 378, 379:

> *But it is said that the teaching is to be upon the historical, biographical, narrative, and literary features of the Bible only, and in this the instruction will be neither sectarian, doctrinal, denominational nor religious.* This might be true if all citizens were agreed that the King James' translation of the Bible is a true version of the scriptures, and then only if the teaching were under the control of those who are selected through the means and methods provided by law. But the vice of the present plan is that school credit is to be given for instruction at the hands of sectarian agents. *Then, too, all citizens are not agreed as to the narrative and historical worth of the Bible.* It is true that some of the events there recorded have shaped the destinies of millions of people, yet they are not mentioned in profane contemporaneous history.

Some are not agreed whether many of the events there narrated are historical or allegorical; whether the earth was created in six days; where Cain obtained his wife; whether the whole earth was covered with a flood of waters; whether Jonah was swallowed by a whale; whether Elijah was translated by a whirlwind into heaven; whether Lot's wife was turned into a pillar of salt; whether our God stopped the sun in its course that Joshua might overcome his enemies; whether he made the waters of the sea to recede that his chosen people might pass to the promised land; whether God spake with the prophets, or ordered the lives of such great rulers as David and Solomon; *are questions all sounding in narrative and history that have excited differences and controversies that are never settled.*

*That Bible history, narrative, and biography cannot be taught without leading to opinion, and ofttimes partisan opinion,* is understood and anticipated by the school board. They admit, as plainly as language can admit, that Bible teaching does lead to sectarian opinion and differences of opinion upon religious questions. They employ the word "religious" in a narrow and sectarian sense. They speak of "religious organizations" and provide that "interpretation" shall be given in the home, or by some "religious organization."

Now we had thought that "history, biography and biblical narrative" would require no interpretation—certainly no interpretation calling for the doctrinal opinion of a religious organization. And who of authority in our schools is to say that a pupil shall, or shall not, have credit if he answers questions in a way that is different from the way intended by those who prepared the course of instruction. It may be said that the pupil is entitled to credit if he answers in a way that is consistent with the faith of his instructor. But there are two objections to this. The one is that the examiner may not know the faith and teachings of those of a different faith; the other and more conclusive objection is that, to give a credit in the public school for such instruction, is to give a credit for sectarian teaching and influence, which is the very thing outlawed by the constitution. (Italics mine.)

I cannot agree with the majority that the views expressed in the *Dearle* case are dicta. The *Dearle* case is the law of this state to which I would adhere.

The majority further states that if this court holds that English 390 is constitutionally prohibited, such holding would result in the elimination of courses in many other fields of instruction, such as zoology, anthropology, theory of evolution, and astronomy, that may be inconsistent with the fundamentalist interpretation of the Bible. I can see no reason to raise this specter. Courses of this nature are not affected by the constitutional prohibitions in article 1, section 11 or article 9, section 4. These courses have no resemblance to religious instruction and in no manner come under the ambit of our constitutional prohibitions, *supra*.

In my judgment the majority has disregarded the basic purpose of the framers of our constitution in adopting article 1, section 11 and article 9, section 4 of our state constitution, which purpose we stated in *Dearle, supra,* at 381:

> We shall not go far afield when we suggest that it is a matter within the common knowledge of those who followed the discussion attending the framing of our constitution *that it was the purpose of the men of that time to avoid all of the evils of religious controversies,* the diversion of school funds to denominational schools and institutions, and the litigation that had occurred in other states. *For it was known that religious opinion is a thing that men will fight for, and sometimes in most insidious ways.* The question then was—and the people who adopted the constitution were so advised—whether we should adopt a constitution which provided *in terms that no religious instruction should ever be a part, directly or indirectly, of the curriculum of our schools.* (Italics mine.)

What has happened in the present case is the very thing that the framers of our constitution sought to avoid: the unquestionable resentment of many of our citizens in knowing their tax dollars support a state university that tolerates religious instruction in a course that discredits the genuineness of a book *sacred* and *holy* to them.

I would reverse the trial court and grant the injunction prayed for.

---

March 8, 1968. Petition for rehearing denied.