48 P.3d 274 (2002)
146 Wash.2d 445
STATE ex rel. Mary GALLWEY, Respondent,
v.
Daniel K. GRIMM, Treasurer of the State of Washington, et al., Appellants,
Washington Association of Independent Colleges and Universities, Intervenor Appellant,
The University of Puget Sound, Intervenor Appellant.
No. 68565-7.
Supreme Court of Washington, En Banc.
Argued June 12, 2001.
Decided June 13, 2002.
*275 Christine Gregoire, Attorney General, Warren Fischer, Asst., Maureen Hart, Asst., Olympia, Reed McClure, William Hickman, Seattle, Attorneys for Petitioner/Appellant.
Perkins Coie, John Alkire, Seattle, John Blankinship, Attorney at Law, Shoreline, Attorneys for Appellee/Respondent.
Aaron Caplan, Attorney at Law, Seattle, Attorney for Respondent.
James McCutcheon, Attorney at Law, Bellevue, Kevin Hasson, Eric W. Treene, Roman Storzer, Anthony Picarello, Washington, Amicus Curiae on Behalf of Becket Fund for Religious Liberty.
Pacific Legal Foundation, Russell Brooks, Bellevue, Pacific Legal Foundation, Sharon Browne, Sacramento, Amicus Curiae on Behalf of Pacific Legal Foundation and Amer. Civil Rights Union.
Davis Wright Tremaine, Michael Reiss, Bergitta Trelstad, Seattle, Amicus Curiae on Behalf of University of Puget Sound.
Wiggins Law Offices, Charles Wiggins, Kennthe Masters, Bainbridge Is., Amicus Curiae on Behalf of Nat'l Assn. of Independent Colleges.
Bendich Stobaugh & Strong, Judith Bendich, Seattle, Steven Green, Alex Luchenitser, Attorneys at Law, Washington, Amicus Curiae on Behalf of Americans United.
Frank Hayes, Attorney at Law, Olympia, Elliott Mincberg, Attorney at Law, Washington, *276 Amicus Curiae on Behalf of People for the American Way.
MADSEN, J.
Mary Gallwey filed this matter as an original action under article IV, section 4 of the Washington State Constitution, seeking a writ of prohibition against Higher Education Coordinating Board (HECB), Daniel Grimm (former State Treasurer), and the Washington Association of Independent Colleges and Universities (WAICU). Gallwey's complaint alleged that Washington's Educational Opportunity Grant (EOG) Program, RCW 28B.101.010, violates article IX, section 4, article I, section 11, and article VIII, section 5 of the Washington State Constitution, and the First Amendment to the United States Constitution.
The EOG Program provides tuition grants of up to $2,500 for upper division course work, which may be used at public or private institutions, for students who have completed an associate of arts degree or its equivalent and are considered "placebound." A placebound student is one who "because of family or employment commitments, health concerns, financial consideration, or similar factors, [is] unlikely to complete the junior or senior year of a baccalaureate degree without enhanced financial assistance."[1] Clerk's Papers (CP) at 1081; RCW 28B.101.020.
We initially transferred this case to Thurston County Superior Court for trial. The trial court struck down the EOG Program on the ground that it violated article IX, section 4 of the Washington State Constitution, which provides that "[a]ll schools maintained or supported wholly or in part by the public funds shall be forever free from sectarian control or influence." Although the trial court found that article IX, section 4 was not intended to apply to institutions of higher education, it nevertheless determined that it was bound by two of this court's prior decisions, Weiss v. Bruno, 82 Wash.2d 199, 509 P.2d 973 (1973), and State Higher Education Assistance Authority v. Graham, 84 Wash.2d 813, 529 P.2d 1051 (1974), to hold otherwise. The trial court did not reach any of Gallwey's additional contentions.
In order to answer the questions in this case we are called on to resolve conflicting cases from this court relating to both article IX, section 4, and article I, section 11. After a thorough review of the constitutional provisions at issue, we reverse and uphold the EOG program under the Washington and United States Constitutions.

FACTS
The findings of fact in this case are uncontested and, therefore, are verities on appeal. St. Francis Extended Health Care v. Dep't of Soc. & Health Servs., 115 Wash.2d 690, 692, 801 P.2d 212 (1990).
a. The EOG Program
In the late 1960s, the Legislature created a system of community colleges designed to provide Washington's citizens with convenient geographic access to the first two years of college and vocational training. CP at 1077. Washington's community college system achieved one of the highest participation rates of any program in the nation. Id. This high participation rate has consistently stood in stark contrast to the comparatively low, and declining, participation rate for upper division (junior and senior level) college course work. Id.
In response to this trend, the HECB was formed in 1985. The HECB was instructed by the Legislature to create a master plan. In its first master plan, in 1987, the HECB determined that Washington ranked 39th in participation at four year colleges, concluding that "much of the state's population, especially in the Spokane, Tri-Cities, Vancouver and Puget Sound areas, has insufficient and inequitable access to upper division baccalaureate *277 education." CP at 1078. It was this revelation that served as the impetus for creation of Washington's branch campus university system, with the branch campuses being limited to upper division course work.[2]
As a further response, a 1988 University of Washington study commissioned by and for the HECB recommended a tuition voucher program for students who had completed the associate of arts degree or its equivalent to use at the region's private universities. This recommendation was based on three findings: (1) Washington's participation rate for upper division course work was 10 percent below the national average; (2) the State's largest population growth was occurring in areas surrounding Seattle that were not served by a public university; and (3) there was a significant disparity in access to upper division course work based on geography. The Washington Business Roundtable joined in the call for a financial aid program providing grants that would allow students the choice of public or independent institutions to complete their upper division course work.
In 1990, the Legislature enacted Laws of 1990, chapter 288, which provides for an EOG of up to $2,500 per year to prospective upper division college students as an incentive to help them complete a baccalaureate degree at schools where there is existing capacity. Applicants must have an associate of arts degree at their enrolling institution, live in an eligible county, have sufficient financial need, and be "placebound."
The EOG program is now codified at chapter 28B.101 RCW. The HECB was called upon to promulgate rules to implement the statutory mandate. The significant program definitions and eligibility criteria follow:
(a) Students must have completed at least two years of college;
(b) They must have earned an associate degree or its equivalent but not a baccalaureate;
(c) They must intend to complete a baccalaureate degree;
(d) They must meet the definition of "placebound," i.e., because of family or employment commitments, health concerns, financial consideration, or similar factors, they are unlikely to complete the junior or senior year of a baccalaureate degree without enhanced financial assistance;
(e) Their place of permanent residence must be within a branch campus service area, defined as Benton, Clark, Cowlitz, Franklin, King, Kitsap, Pierce, Skamania, Snohomish, Spokane, Thurston, Walla Walla, and Yakima Counties;
(f) They must be willing to attend a Washington public or private four year college or university with existing unused capacity;
(g) Recipients may not use the grant at any of the five branch campuses;
(h) They must adhere to the EOG Program's religious exclusion;
(i) The student must demonstrate financial need as calculated by the institution using the federal methodology formula. The student's EOG award, in combination with other forms of aid, may not exceed the calculated need;
(j) The award must replace unmet need or self-help assistance.
CP at 1081.
Students submit an application to apply for an EOG. The application consists of three parts. The student completes parts A and B. Part C, the "School Financial Aid Worksheet," is completed by the financial aid administrator using financial aid information to determine applicant eligibility and to provide the database for recipient profiles. The student may submit parts A and B directly to the HECB or to the school, which will then forward the entire application to the HECB. As part of the application the student must sign an agreement, including a statement of understanding, that the college "shall not require the student to be enrolled in any program that includes religious worship, exercise, *278 or instruction, and that the student cannot be pursuing any degree in religious, seminarian, or theological academic studies while receiving the EOG." CP at 1082.
Once an application is received the HECB screens it for completeness and eligibility. Then, a selection committee reviews the applications, awarding points based on an applicant's placebound status and financial need. Priorities for available funding are for renewals first, new full-time applicants second, and third year petitions last. No preference is given, dependent on an applicant's desire to attend either a public or private institution.
Public institutions may disburse the EOG to the student or credit it to the student's account. Private institutions must disburse the EOG directly to the student rather than automatically placing the funds in the student's account at the school. Students must be provided the opportunity to cash the EOG at his or her own bank or to request that the funds be disbursed directly to the student's account at the educational institution. Title to the grant funds transfers from the State to the student during disbursement.
Just as the student must sign an agreement, the institution's financial aid officer must sign the HECB-produced Institutional Certification of Student Eligibility form, which certifies:
(a) The student will not be required by the institution to be involved in any educational program that includes any religious worship, exercise, or instruction;
(b) Will not, for the duration of the academic year during which the grant is disbursed, be enrolled for any classes that include any religious worship, exercise, or instruction, or be pursuing a degree in religion, seminarian, or theological academic studies; and further,
(c) Is precluded by the institution, for the duration of the award period during which the grant is disbursed, from enrolling in any classes determined by the institution to include any religious worship, exercise, or instruction, or from pursuing a degree in religion, seminarian, or theological academic studies.
CP at 1086.
b. Procedural History of this Lawsuit
In 1995, Mary Gallwey, in her capacity as a taxpayer and resident of Washington, filed this matter as an original action under article IV, section 4 of the Washington State Constitution, seeking a writ of prohibition. The named respondents were the HECB and Daniel Grimm, the State Treasurer at the time. The WAICU also intervened as a respondent. Gallwey alleged that Washington's EOG Program, RCW 28B.101.010, violates article IX, section 4, article I, section 11, and article VIII, section 5 of the Washington State Constitution, and the First Amendment Establishment Clause of the United States Constitution. She sought a judgment declaring the EOG program invalid and prohibiting further disbursements by the State. The Supreme Court Commissioner transferred the case to Thurston County Superior Court for trial.
After a trial, the Thurston County Superior Court struck down the EOG program on the ground that it violated article IX, section 4 of the Washington State Constitution, which provides that "[a]ll schools maintained or supported wholly or in part by the public funds shall be forever free from sectarian control or influence." Specifically, the trial court found that
[t]he EOG Program, as applied to students attending Northwest College and all private institutions of higher learning represented by intervenor respondent WAICU (except the University of Puget Sound), violates Article IX, § 4 of the Washington Constitution.
CP at 1245. Those institutions affected by the trial court's ruling are St. Martin's College, Seattle University, Pacific Lutheran University, Gonzaga University, Whitworth College, Seattle Pacific University, Northwest College, and Heritage College. CP at 1248-50.
The Thurston County Superior Court found that article IX, section 4 was not intended to apply to institutions of higher education, but nevertheless determined that it *279 was bound by this court's decisions in Weiss, 82 Wash.2d 199, 509 P.2d 973 and Graham, 84 Wash.2d 813, 529 P.2d 1051. In both Weiss and Graham, this court applied article IX, section 4 to institutions of higher education without addressing the specific question of whether the provision should apply to higher education.
The trial court did not reach any of Gallwey's additional contentions, and, on its own motion, determined that the EOG Program should not be enjoined pending a decision by this court. As explained by the trial court:
As I have previously stated during other hearings, I fully expect that this decision will be reversed by the Supreme Court because Article IX, § 4 was never intended to apply to institutions of higher education, however, that decision rests with the Supreme Court not with the Superior Court of Thurston County.
Because I expect that my decision will be reversed, I am not inclined to order the Higher Education Coordinating Board to stop payments during this interim time period. If petitioner requests a moratorium on payments while the case is on appeal, that request should be made to the Supreme Court.
CP at 647. The University of Puget Sound, the Pacific Legal Foundation and American Civil Rights Union, the Becket Fund for Religious Liberty, and the National Association of Independent Colleges and Universities (NAICU) have all filed amici curiae briefs in support of reversal. Americans United for the Separation of Church and State, and People for the American Way, have jointly filed an amici curiae brief in support of affirmance.

ANALYSIS
We begin our analysis with the settled principle that a party challenging the constitutionality of a statute must demonstrate beyond a reasonable doubt that the statute is invalid and must rebut the presumption that all legally necessary facts exist. County of Skamania v. State, 102 Wash.2d 127, 132, 685 P.2d 576 (1984); In re Marriage of Johnson, 96 Wash.2d 255, 258, 634 P.2d 877 (1981); City of Bellevue v. State, 92 Wash.2d 717, 720, 600 P.2d 1268 (1979). With this principle in mind, we will, in turn, analyze each of Gallwey's constitutional arguments.
A. Article IX, section 4
The principal issue in this case is whether the EOG Program is invalid under article IX, section 4 of the Washington State Constitution. That provision provides:

All schools maintained or supported wholly or in part by the public funds shall be forever free from sectarian control or influence.
Const. art. IX, § 4 (emphasis added). It is this court's "duty under article 9, section 4 to ascertain first whether [the EOG Program] supports the subject schools, even in part, with public funds and second, if so, whether these schools are free from sectarian control or influence." Weiss, 82 Wash.2d at 205-06, 509 P.2d 973.
Neither party seriously disputes that the EOG Program supports the subject colleges and universities with public funds. Indeed, our prior decisions have foreclosed any credible argument to the contrary. See id. at 207, 509 P.2d 973 ("we long ago rejected the theory that `indirect' or `incidental' state support... is permissible"); Graham, 84 Wash.2d at 817, 529 P.2d 1051 (invalidating program that purchased school loans of needy college students because such funds will "assist[] the student to stay in school"). Instead, appellants contend that article IX, section 4 was not intended to be applied to institutions of higher education because the phrase "all schools" does not bring them within its grasp. Appellants further argue that even if the provision is applied to institutions of higher education, the member schools of the WAICU are free from sectarian control or influence.
As noted, the trial court accepted appellants' argument "that Article IX, § 4 of the Washington Constitution was not intended to apply to institutions of higher education," CP at 1245, but felt constrained to hold otherwise by two of this court's prior unanimous decisions, Weiss, 82 Wash.2d 199, 509 P.2d 973, and Graham, 84 Wash.2d 813, 529 P.2d 1051. The parties dispute the extent to *280 which Weiss and Graham are precedential on this point. Although both decisions applied article IX, section 4 to institutions of higher education, neither directly addressed the question of whether the phrase "all schools" encompasses institutions of higher education.
Prior to addressing the import of Weiss and Graham to this case, it is important to note that the question of whether or not a "school" under article IX, section 4 includes a university was not totally untouched by this court at the time these cases were decided. In Litchman v. Shannon, 90 Wash. 186, 155 P. 783 (1916), this court was presented with a challenge to the University of Washington's ability to charge tuition. It was alleged that article XXVI and article IX, sections 1 and 2, which mandate that the State provide free "public school" education, applied to the State's universities. This court held that the University of Washington was not a public school within the meaning of article IX. Id. at 191, 155 P. 783 ("A school is `an institution of learning of a lower grade, below a college or a university. A place of primary instruction.'"). Also, just prior to this court's decisions in Weiss and Graham, in a case dealing with article IX, section 1, this court flatly stated that "[a]rticle 9 does not apply to the University of Washington, but is addressed only to the `common schools.'" DeFunis v. Odegaard, 82 Wash.2d 11, 43, 507 P.2d 1169 (1973) (citations omitted). Neither Weiss nor Graham acknowledged Litchman or DeFunis.
Two separate legislative enactments were challenged in Weiss. The first was a financial assistance program for students in grades 1-12, which provided monetary grants to needy students attending public and private schools. Funds were disbursed to help students with purchasing supplies, tuition, books, and incidental and other fees. The second enactment was a "`tuition supplement program to undergraduate resident students attending an accredited independent or private institution of higher education within the state of Washington.'" Weiss, 82 Wash.2d at 222, 509 P.2d 973 (quoting former RCW 28B.10.832 (1971) (repealed 1985)).
This court struck down both of the programs, noting that the breadth of article IX, section 4 is sweeping:
[T]he proscription of article 9, section 4 is far stricter than the more generalized prohibition of the first amendment to the United States Constitution. While the establishment clause broadly condemns any law "respecting an establishment of religion," our constitution specifically demands that no public funds be used to maintain or support any school which is under sectarian control or influence. There is no such thing as a "de minimis" violation of article 9, section 4. Nor is a violation of this provision determined by means of a balancing process. The words ... mean precisely what they say; the prohibition is absolute.
. . . .
In interpreting this provision we long ago rejected the theory that "indirect" or "incidental" state support of a sectarian school is permissible.
Id. at 206-07, 509 P.2d 973 (footnote omitted). In striking down the higher education tuition supplement program, this court stated that "the ultimate result of both the act and the plan here is to support, in part, the schools in question with public funds." Id. at 224, 509 P.2d 973. Despite this court's reference to institutions of higher education as "the schools" the question of whether article IX, section 4 was intended to apply to institutions of higher education was neither raised nor critically examined.
One year after Weiss, in 1974, this court decided Graham. The enactment challenged in Graham was a student loan purchase program, whereby a corporate authority was established to buy student loans from financial institutions and educational institutions as a form of aid to needy students. This court unanimously struck down the enactment, stating that
[t]he whole problem of aid to sectarian schools has been considered by this court on many occasions. The most recent case on that issue was Weiss v. Bruno ....
. . . .
In Weiss v. Bruno ... the money was required to be used for tuition. In the *281 instant case the funds are loaned to the student to use in attending college. Part of the loaned funds will almost certainly be used to pay tuition, and the remainder will benefit the college in many ways by assisting the student to stay in school. In short, the form is different from Weiss, but the substance is in no way different.
Graham, 84 Wash.2d at 817, 529 P.2d 1051.
Just as in Weiss, this court applied article IX, section 4 to institutions of higher education, but did not address the question of whether the provision was intended to apply to higher education. No party in either Weiss or Graham briefed the issue. Nevertheless, there is no doubt that the holdings of Weiss and Graham assume that article IX, section 4 applies to institutions of higher education.
As our review of the cases makes clear, this court's article IX, section 4 jurisprudence has been traveling on two divergent tracks. Accordingly, it is our obligation to resolve the apparent conflict between our decisions in Litchman and DeFunis and the Weiss and Graham cases.
Initially, it should be noted that this court is not constrained to follow a decision where the opinion's holding controls an issue, but the issue was not raised in the case. As this court has stated:
Without discussing the economic loss rule or whether a cause of action may be brought in tort for economic damages due to construction delays, this court affirmed the subcontractor's jury verdict against the architect for negligence. In cases where a legal theory is not discussed in the opinion, that case is not controlling on a future case where the legal theory is properly raised. See Webster v. Fall, 266 U.S. 507, 511, 45 S.Ct. 148, 69 L.Ed. 411 (1925) (questions which merely lurk in the record, but are neither brought to a court's attention nor ruled upon, are not considered to have been decided so as to constitute precedent)....
Berschauer/Phillips Constr. Co. v. Seattle Sch. Dist. No. 1, 124 Wash.2d 816, 824, 881 P.2d 986 (1994); see also ETCO, Inc. v. Dep't of Labor & Indus., 66 Wash.App. 302, 306-07, 831 P.2d 1133 (1992). As this court noted in Greene v. Rothschild, 68 Wash.2d 1, 8, 402 P.2d 356 (1965), stare decisis will not be applied where to do so would perpetuate error so long as no property rights would be affected by overruling the prior decision. Accordingly, since Weiss and Graham contain no analysis concerning whether institutions of higher learning are "schools" within the meaning of article IX, section 4, they are not binding precedent.
As in any dispute involving a constitutional question, we must determine the intended meaning of article IX, section 4. "Appropriate constitutional analysis begins with the text and, for most purposes, should end there as well. The text necessarily includes the words themselves, their grammatical relationship to one another, as well as their context." Malyon v. Pierce County, 131 Wash.2d 779, 799, 935 P.2d 1272 (1997). This court's "objective is to define the constitutional principle in accordance with the original understanding of the ratifying public so as to faithfully apply the principle to each situation which might thereafter arise." Id.
Respondent's first argument is that the term "all" in the phrase "all schools" acts to include institutions of higher education within its scope. Specifically, respondent notes that within article IX the term "school" is normally used as a compound term. See art. IX, § 2 (common schools, public schools, high schools, normal schools, technical schools). According to respondent, this means that the term "all" is broad enough to sweep within its scope universities.
However, respondent's argument turns on one major assumption, that the term "school" can fairly be said to include institutions of higher education. Respondent cites to a 1990 edition of Black's Law Dictionary that broadly defines school as an "institution or place for instruction or education." Br. of Resp't at 27. But, as appellants note, a dictionary definition published over one hundred years after the constitution's ratification provides little guidance in ascertaining "the original understanding of the ratifying public." Malyon, 131 Wash.2d at 799, 935 P.2d 1272. In fact, as appellants observe, there are significant indications that a different *282 meaning may have been intended by the delegates.
Congress allowed Washington to join the Union pursuant to the Enabling Act, which also permitted the admittance of North Dakota, South Dakota, and Montana. Enabling Act, ch. 180, 25 Stat. 676 (1889). As a condition of statehood, Washington was required to provide "for the establishment and maintenance of systems of public schools, which shall be open to all the children of said States, and free from sectarian control." Enabling Act, § 4. This mandate was embodied in the portion of Washington's constitution reiterating its contract with the United States. Article XXVI of Washington's constitution provides that "[p]rovision shall be made for the establishment and maintenance of systems of public schools free from sectarian control, which shall be open to all the children of said state."
The Honorable W. Lair Hill proposed a constitution for the State of Washington that was submitted to the delegates of the constitutional convention of 1889, and served as a working draft. Journal of the Washington State Constitutional Convention, 1889, at v (Beverly Paulik Rosenow ed., 1962). The original complete text of what was later to become article IX, section 4, provides:
The legislature shall provide for the establishment and maintenance of a thorough and efficient system of common schools which shall be open to all the children of the state, and in which all the children of the state may receive a good common school education; and may establish such schools of higher grade as may be deemed expedient. All schools maintained or supported wholly or in part by the public funds shall be forever free from sectarian control or influence.

(Emphasis added.)
This draft provision was ultimately separated out in the Washington State Constitution. The second sentence was taken verbatim and became article IX, section 4. The first sentence was rewritten and became article IX, section 2:
The legislature shall provide for a general and uniform system of public schools. The public school system shall include common schools, and such high schools, normal schools, and technical schools as may hereafter be established. But the entire revenue from the common school fund and the state tax for common schools shall be exclusively applied to the support of the common schools.
Respondent contends that Hill's draft provision provides evidence that the term "all schools" includes institutions of higher education. According to respondent, because the first sentence of the draft states that the Legislature "may establish such schools of higher grade as may be deemed expedient," and the second sentence refers to "all schools," the second sentence must refer to universities. However, this argument assumes that "schools of higher grade" include universities, and further fails to take into account that this part of the provision was deleted by the delegates and rewritten to include only "high schools, normal schools, and technical schools."
In fact, Hill's commentary provides some insight as to his intentions in the drafting of this provision:
This section is taken from the constitution of Illinois, modified only so far as it seems necessary to bring it in conformity to the provision of this subject in the act of congress providing for the admission of the state.
Hill, of course, is referring to the Enabling Act, and specifically that provision dealing with the creation of public schools, which was later embodied in article XXVI of the Washington State Constitution. The Illinois constitutional provision Hill refers to required the state to provide "`a thorough and efficient system of free schools, whereby all children of this state may receive a good common school education.'" Robert F. Utter & Edward J. Larson, Church and State on the Frontier: The History of the Establishment Clauses in the Washington State Constitution, 15 Hastings Const. L.Q. 451, 475 n. 122 (1988) (quoting Ill. Const. of 1870, art. VIII, § 1).
Early case law from this court indicates that Hill's use of the term "school" was intended to be far more limited than that term *283 is commonly interpreted today. See State v. Reece, 110 Wash.2d 766, 779, 757 P.2d 947 (1988) ("early constructions by the courts are relevant to the intent of various constitutional provisions"); Ino Ino, Inc. v. City of Bellevue, 132 Wash.2d 103, 120, 937 P.2d 154 (1997) ("State cases and statutes from the time of the constitution's ratification, rather than recent case law, are more persuasive in determining" the protections of a constitutional provision).
In Litchman, 90 Wash. 186, 155 P. 783, decided in 1916, less than 30 years after ratification, this court was presented with a challenge to the University of Washington's ability to charge tuition. Specifically, it was alleged that article XXVI and article IX, sections 1 and 2, mandate that the State provide free education at the State's universities. This court was thus required to interpret the meaning of the phrase "public school." This court stated:
The framers of the constitution, had they desired, might in that section have included the university, but did not. Public schools are usually defined as schools established under the laws of the state, usually regulated in matters of detail by the local authorities in the various districts, towns, or counties, and maintained at the public expense by taxation, and open without charge to the children of all the residents of the town or other district. Black['s] Law Dictionary (2d ed.); Jenkins v. Andover, 103 Mass. 94; Merrick v. Amherst, 94 Mass. 500, 12 Allen 500. A school is "an institution of learning of a lower grade, below a college or a university. A place of primary instruction." Black's Law Dictionary (2d ed.).
Id. at 191, 155 P. 783 (emphasis added). It is only if Hill intended the term "school" to exclude universities, that his commentary indicating that his draft provision is in compliance with the Enabling Act and consistent with the Illinois constitution (which did not apply to higher education) is tenable.
Amicus NAICU notes that in the original constitution, as drafted in 1889, there is additional evidence that the term "school" was not understood to include universities at the time of ratification. Article XVI, section 2, a provision not at issue in this case, refers to "school and university land":
None of the lands granted to the state for educational purposes shall be sold otherwise than at public auction to the highest bidder ... provided, that the sale of all school and university land heretofore made by the commissioners of any county or the university commissioners when the purchase price has been paid in good faith, may be confirmed by the legislature.
Art. XVI, § 2. If the phrase "all schools" encompassed universities, article XVI's differential treatment of the terms would be merely nullified. See Nisqually Delta Ass'n v. DuPont, 95 Wash.2d 563, 568, 627 P.2d 956 (1981) (whenever possible, courts should avoid a statutory construction which nullifies, voids, or renders meaningless or superfluous any section or words).
The structure and history of article IX lend further support to the conclusion that article IX, section 4 was not intended to apply to institutions of higher education. The most notable fact is that article IX does not contain any references to higher education. In fact, in article IX, section 2, which contains a more specific definition than article IX, section 4, universities were specifically excluded. That provisions states that "[t]he public school system shall include common schools, and such high schools, normal schools, and technical schools." "[T]he mention of one thing implies the exclusion of others...." W. Telepage, Inc. v. City of Tacoma, 140 Wash.2d 599, 611, 998 P.2d 884 (2000). Indeed, just prior to this Court's decisions in Weiss and Graham, in a case dealing with article IX, section 1, this Court stated that "[a]rticle 9 does not apply to the University of Washington, but is addressed only to the `common schools.'" DeFunis, 82 Wash.2d at 42, 507 P.2d 1169 (citations omitted).
Additionally, as appellants note, during the Constitutional Convention all explicit references to higher education were purged from article IX. On October 7, 1889, the Committee on Education and Educational Institutions submitted its report to the Constitutional Convention. Journal at 276-77. The proposed section 3 of article IX stated: *284 The principal of the common school fund shall remain permanent and irreducible. The said fund shall be derived from the following named sources, to wit: Appropriations and donations by the state to this fund; donations and bequests by individuals to the state or public for educational institutions; the proceeds of lands....
Journal at 277. The proposed section 5 of article IX also contained a reference to higher education:
All losses to the permanent common school or any state college or university fund, which shall have been occasioned by defalcation, mismanagement or fraud....
Id.
On August 10, 1889, the Constitutional Convention took up the committee's proposals. Mr. Turner moved to strike the words "educational institutions" from section 3 and insert "common schools." The motion passed. Journal at 328. Mr. Bowen moved to strike "any State or University" from section 5 and insert the words "other state educational." The motion passed. Journal at 330. Mr. Lindsley offered an additional section to article IX that would have pertained to the University of Washington:
The University of Washington shall constitute a public trust and its organization and government shall be subject to legislative control, but it shall forever be independent and free from partisan and sectarian influence.
Journal at 330. Mr. Lindsley's proposed section was not adopted.
In the end, article IX was left devoid of references to higher education. These institutions were instead addressed in article XIII:
Educational ... and such other institutions as the public good may require, shall be fostered and supported by the state, subject to such regulations as may be provided by law. The regents, trustees, or commissioners of all such institutions existing at the time of the adoption of this Constitution, and of such as shall thereafter be established by law, shall be appointed by the governor, by and with the advice and consent of the senate; and upon all nominations made by the governor, the question shall be taken by ayes and noes, and entered upon the journal.
Article XIII. See 1967 Op. Att'y Gen. 101, at 3 n. 2 (article XIII addresses governance of institutions of higher education).
Based on the abundance of structural and historical evidence available, we hold that article IX, section 4 was not intended to apply to institutions of higher education. Accordingly, it is unnecessary for us to address other questions raised with respect to this constitutional provision.
In reaching our conclusion, we affirm our prior decisions in Litchman and DeFunis and overrule Weiss and Graham to the extent that they conflict with our analysis here. Nothing in today's decision is intended to disturb this court's holding in Weiss as it relates to common school.
B. Article I, section 11
Although the issue was not reached by the trial court, respondent additionally contends that the EOG Program violates article I, section 11 of the Washington State Constitution. That section provides in part:
No public money or property shall be appropriated for or applied to any religious worship, exercise or instruction, or the support of any religious establishment....
Art. I, § 11.
The terms "appropriated" and "applied" modify religious worship, exercise or instruction, and the support of any religious establishment. Thus, what article I, section 11 prohibits is the "appropriation" or "application" of public money to any of these enumerated purposes.
This court recently held that the terms "appropriated" and "applied" as used in article I, section 11
require one to determine whether our government has purposefully transferred, or made available, money or property for the defined objective. Ultimate utilization of the money or property is a necessary but insufficient part of the constitutional test; a religious purpose is the key.

*285 Without proceeding further it is at once apparent that the appropriation of money, or application of property, to effectuate any objective other than religious worship, exercise, instruction, or religious establishment is not within the prohibition.
Malyon, 131 Wash.2d at 799-800, 935 P.2d 1272.
Regardless of the ultimate impact of the EOG Program, it is clear that it was not enacted with the "objective" of aiding religious establishment and it has no "religious purpose." Given the obvious purpose of the EOG Program, the trial court appropriately found that
[t]he funds issued under the terms of Chapter 28B.101 RCW and the administrative regulations adopted pursuant thereto are issued to students to assist them in completing a four year undergraduate degree. The purpose of this legislation and the funds issued to students pursuant to it is entirely secular.
CP at 1099-1100.
Cases prior to our decision in Malyon, although differing in their approach, also support the conclusion that the EOG is constitutional under article I, section 11. In interpreting the phrase "religious ... instruction," as used in article I, section 11, this court stressed
that the words appear after two more specific terms: "worship" and "exercise." This, we believe, is an indication that the framers of our constitution did not intend the word "instruction" to be construed without limit, but that the proscribed field be confined to that category of instruction that resembles worship and manifests a devotion to religion and religious principles in thought, feeling, belief, and conduct, i.e., instruction that is devotional in nature and designed to induce faith and belief in the student.
Calvary Bible Presbyterian Church v. Bd. of Regents, 72 Wash.2d 912, 919, 436 P.2d 189 (1967).
In Witters v. Commission for the Blind, 112 Wash.2d 363, 771 P.2d 1119 (1989) (Witters II), this court considered whether the Washington State Constitution prohibited the State Commission for the Blind from granting vocational rehabilitation funds to a visually handicapped applicant to use at a religious institution for a course of study designed to prepare him for a career as a pastor, missionary or youth director. The court focused on the term "religious instruction." Recognizing that religious instruction means, ""instruction that is devotional in nature and designed to induce faith and belief in the student,"" the court was persuaded that the use of vocational assistance funds would violate article I, section 11 because the plaintiff, who was pursuing a degree in biblical studies, would necessarily be required to attend courses that provided indoctrination in the specific beliefs of Christianity. Witters II, 112 Wash.2d at 369, 771 P.2d 1119 (quoting Calvary Bible, 72 Wash.2d at 919, 436 P.2d 189). The plaintiff's course of study included Old and New Testament studies, ethics, speech and church administration. Witters II, 112 Wash.2d at 365, 771 P.2d 1119. The court concluded, "our state constitution prohibits the taxpayers from being put in the position of paying for the religious instruction of aspirants to the clergy with whose religious views they may disagree." Witters II, 112 Wash.2d at 365, 771 P.2d 1119. In Witters (I) this court observed that "[a]ppellant is not pursuing a secular course of study with the personal objective of becoming a minister.... It is not the role of the State to pay for the religious education of future ministers." Witters v. Comm'n for the Blind, 102 Wash.2d 624, 629, 689 P.2d 53 (1984).
The distinction between this case and Witters is obvious. Here, the grants are made contingent upon a student's adherence to the EOG Program's religious exclusion which provides that no student will be enrolled in any program that includes religious worship, exercise, or instruction. Former RCW 28B.101.040 (1993).
It is also clear that the EOG Program does not support "religious establishment," as that phrase has been interpreted by this court. The phrase "religious establishment" is a term of art in constitutional jurisprudence. See U.S. Const. amend I ("Congress shall make no law respecting an establishment of religion ...." (emphasis added)). In its *286 most general sense, "religious establishment" refers to the prohibition against governmental creation of a state religion. The corollary to this principle is that the state should not support those institutions that indoctrinate others into a religious faith, and thus place the imprimatur of the state on a particular religious doctrine, or the preference of religion over no religion. See Visser v. Nooksack Valley Sch. Dist. 506, 33 Wash.2d 699, 708, 207 P.2d 198 (1949) (holding that Christian school that teaches the tenets of a religion to induce faith, and inculcate youth into its religious beliefs, is a religious establishment); Mitchell v. Consolidated Sch. Dist. 201, 17 Wash.2d 61, 64, 135 P.2d 79 (1943) (emphasizing "that the religious tenets of such sect are taught as a part of the regular curriculum of the school"). In this case, in contrast, no funding is given for "religious ... instruction," as the EOG Program requires that the student not "be enrolled for any program that include any religious worship, exercise, or instruction" nor is support given for religious establishment. This is aptly illustrated by the trial court's uncontested findings of fact, which we are bound to accept on appeal:
None of the [WAICU] colleges or universities identified in General Finding No. 1 teach the tenets of any denomination or religious sect as a regular part of their curriculum. No church, religious denomination or religious sect controls the conduct of the faculty in their classroom, the course material used in any class or the course offerings in any curriculum at any of the colleges or universities.
CP at 1099.
The dissent is not satisfied, however, and looks beyond the fact that funds are expended to enable "placebound" needy students to receive a general, non-religious four-year college degree to the ultimate use to which the educational institution may put those tuition dollars. "[O]nce public funds are provided to an educational institution controlled by a religious organization with a religious mission, functionally, do those funds advance religious doctrine?" Dissent at 297.
The dissent goes too far. Under the dissent's reasoning, the State could not provide medical coupons to an eligible Department of Social and Health Services client if the coupons were to be used at a hospital with religious affiliations simply because the funds might be used to advance the religious goals of the hospital. However, this court's cases have not drawn the dissent's boundary. In Health Care Facilities Authority v. Spellman, 96 Wash.2d 68, 633 P.2d 866 (1981) this court held that religious hospitals can raise money through public tax exempt bonds without violating article I, section 11, even though this method of financing conferred a great benefit on the religious establishment. As this court stated in Perry v. School District No. 81, 54 Wash.2d 886, 897, 344 P.2d 1036 (1959), "[i]t was never the intention that our constitution should be construed in any manner indicating any hostility toward religion."
A further concern created by the dissent's approach is that it fails to apply the analytical framework set forth so recently in Malyon. The dissent claims that Malyon sets up a test under article I, section 11 that does not apply to education. According to the dissent, we apply a strict construction of article I, section 11 and article IX, section 4 in the context of education. "If, however, the challenge does not involve education, we merely determine whether the State's objective was support of `religious worship.'" Dissent at 298. The dissent's reasoning reflects the same confusion that led the court in Weiss and Graham to conflate article I, section 11 and article IX, section 4.
The history of article IX, section 4, as set out above, reflects a concern with religious influence in public schools. Accordingly, most of the cases cited by the dissent involve public schools, which fall within the prohibitions of article IX, section 4. See, e.g., State ex rel. Dearle v. Frazier, 102 Wash. 369, 173 P. 35 (1918) (curricula of public high school cannot include religious exercise or instruction); Perry v. Sch. Dist. 81, 54 Wash.2d 886, 344 P.2d 1036 (1959) (use of public school facilities to promote attendance at religious education program unconstitutional); Mitchell v. Consol. Sch. Dist. 201, 17 Wash.2d 61, 135 P.2d 79 (1943) (statute permitting use of common school funds to provide transportation *287 to private schools violates state constitution); Visser v. Nooksack Valley Sch. Dist. No. 506, 33 Wash.2d 699, 207 P.2d 198 (1949) (bus transportation to private school children violates state constitution). As Justice Weaver pointed out in his concurrence in Perry, 54 Wash.2d at 898, 344 P.2d 1036,
Art. IX, § 4, ... is more proscriptive than [art. I, sec. 11].
That it is so is the result of deliberate action by the constitutional convention of 1889. It appears from the journal of the Washington State Constitutional Convention, 1889, p. 335 (unpublished; the original is in the office of the Secretary of State), that J.Z. Moore, a member of the convention and a lawyer from Spokane, moved to strike the words "or influence" from the section. The motion lost 39 to 11.
Article IX, section 4 and its history justifies the rigorous scrutiny given by this court to cases involving public schools.
However, there is no support for the dissent's claim that article I, section 11, when applied to issues involving colleges and universities, requires heightened scrutiny that is not applied to any other situations challenged under article I, section 11. The prohibitions in article I, section 11 are the same regardless of the circumstances, and the constitutional analysis should, accordingly, be even-handed with regard to all challenges. This does not abandon the framers' specific concern with schools because article IX, section 4 assures separation of church and state in public funding of schools. Although not followed by the dissent, Malyon provides the proper analysis in this case.
We hold that the EOG Program does not violate article I, section 11 of the Washington State Constitution.
C. The First Amendment to the United States Constitution
Respondent's final contention is that the EOG Program violates the First Amendment to the United States Constitution, which provides:
Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.
U.S. Const. amend. 1. In Lemon v. Kurtzman, the Supreme Court identified three criteria used to evaluate government programs challenged under the establishment clause:
First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster "an excessive government entanglement with religion."
Lemon v. Kurtzman, 403 U.S. 602, 612-13, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) (citation omitted).
Respondent's sole argument under the establishment clause is that the EOG program fosters an excessive government entanglement with religion. Before reaching this issue, we note that if respondent's argument were meritorious virtually every form of federal student financial aid, which is given neutrally to public and private school students, would run afoul of the First Amendment.
In Agostini v. Felton, 521 U.S. 203, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997), the Supreme Court upheld the state supported use of public school teachers to teach remedial subjects in parochial schools. In Agostini, the Court noted that the question of "excessive entanglement" cannot be addressed in a vacuum:
Regardless of how we have characterized the issue, however, the factors we use to assess whether an entanglement is "excessive" are similar to the factors we use to examine "effect." That is, to assess entanglement, we have looked to "the character and purposes of the institutions that are benefited, the nature of the aid that the State provides, and the resulting relationship between the government and religious authority."
Agostini, 521 U.S. at 232, 117 S.Ct. 1997.
The Supreme Court has upheld neutrally applied state educational aid that is significantly more invasive and linked with religion than the EOG program, which, as already *288 noted, contains myriad easily administered religious safeguards. For example, in Witters v. Department of Services for the Blind, 474 U.S. 481, 106 S.Ct. 748, 88 L.Ed.2d 846 (1986), the Supreme Court upheld the use of neutrally administered state funds to fund a blind student's tuition at the Inland Empire School of the Bible where he pursued a religious education to prepare himself for a career as a pastor, missionary, or youth director. As the Court stated:
As far as the record shows, vocational assistance provided under the Washington program is paid directly to the student, who transmits it to the educational institution of his or her choice. Any aid provided under Washington's program that ultimately flows to religious institutions does so only as a result of the genuinely independent and private choices of aid recipients. Washington's program is `made available generally without regard to the sectarian-nonsectarian, or public-nonpublic nature of the institution benefited,' and is in no way skewed towards religion.
Id. at 487-88, 106 S.Ct. 748 (footnote and citation omitted).
We hold that the EOG Program does not violate the First Amendment to the United States Constitution.
We share the heartfelt concerns expressed by the dissent regarding religious freedom. However, as the United States Supreme Court has observed:
[T]he Constitution [does not] require complete separation of church and state; it affirmatively mandates accommodation, not merely tolerance, of all religions, and forbids hostility toward any.
Lynch v. Donnelly, 465 U.S. 668, 673, 104 S.Ct. 1355, 79 L.Ed.2d 604, 610 (1984). "The question is not whether government and religion will interact, but how." Malyon, 131 Wash.2d at 805, 935 P.2d 1272 (quoting Lawrence H. Tribe, American Constitutional Law § 14-14, at 1276 (2d ed.1988)).

CONCLUSION
The EOG Program was designed to meet the critical needs of "placebound" students, like Richard Pacheo who, because he cares for his blind mother and diabetic father with Alzheimer's disease, cannot travel to a state institution to obtain a college degree. The Legislature enacted the grant program based upon findings that (1) Washington's participation rate for upper division course work was 10 percent below the national average; (2) the state's largest population growth was occurring in areas surrounding Seattle that were not served by a public university; and (3) there was a significant disparity in access to upper division course work based on geography. The funds associated with this program are disbursed directly to financially needy students who then choose the institution that is most accessible.
We hold that the EOG Program does not violate article IX, section 4 of the Washington State Constitution because that provision does not apply to institutions of higher education. We further hold that the EOG Program does not violate article I, section 11 of the Washington State Constitution or the First Amendment to the United States Constitution.
ALEXANDER, C.J., SMITH, JOHNSON, MADSEN, OWENS, JJ., concur.
JOHNSON, J. (concurring).
I agree with the result of Justice Madsen's majority opinion and with most of its analysis, but write separately to provide a more structured analytical framework to support the majority's conclusions regarding the interplay between article IX and article I, section 11 of the Washington Constitution. I fully concur with Justice Madsen's conclusion that article IX does not apply to universities. To the extent they suggest otherwise, Weiss v. Bruno[1] and State Higher Education Assistance Authority v. Graham[2] must be overruled.
A structured analysis also exposes the weaknesses permeating Justice Chambers' dissent. These weaknesses flow from his *289 assumption that article IX applies to this case (in conjunction with article I, section 11). By holding universities are not included in the constitutional definition of schools, Litchman v. Shannon, 90 Wash. 186, 155 P. 783 (1916), precludes Justice Chambers' analysis.
In Litchman, we were faced with a challenge that article IX, by requiring public schools to be open to all children, prevented the University of Washington from charging tuition because tuition would prevent some children from attending the university. To analyze this issue, we looked at state constitutional and common law history and the text of the state constitution and its parallel provisions (particularly the definition of "schools" in article IX, section 2). These constitutional factors were compared to the history of the University of Washington and the legislation regarding the university. We held article IX, section 2, defines what the public school system includes: "`common schools, and such high schools, normal schools, and technical schools as may hereafter be established.'" Litchman, 90 Wash. at 191, 155 P. 783. Looking at the state constitutional definition and the definition of "school" in Black's Law Dictionary, we concluded the framers could have included universities in the definition of schools, but did not. It was within the Legislature's discretion to determine whether entrance and tuition fees could be charged because universities were not schools under the constitution. Litchman, 90 Wash. at 193, 155 P. 783.
The foundation of Justice Chambers' analysis linking article IX with article I, section 11 completely crumbles when this critical limitation on the reach of article IX is recognized. Article I, section 11 must be analyzed separately. Stripped from the unfounded approach advocated by Justice Chambers, a structured analysis shows Washington's Educational Opportunity Grant Program (EOG Program) does not violate article I, section 11.
In State v. Gunwall,[3] we adopted a factored approach to apply in resolving questions of state constitutional interpretation. The Gunwall factors are: (1) the textual language of the state constitution; (2) the text of parallel provisions of the state constitution; (3) state constitutional and common law history; (4) preexisting state law; (5) the structure of the state constitution; and (6) matters of particular state interest or local concern. Gunwall, 106 Wash.2d at 61-62, 720 P.2d 808. We most recently applied these factors in interpreting article I, section 11 in Malyon v. Pierce County, 131 Wash.2d 779, 935 P.2d 1272 (1997). They have also been examined and applied in the dissenting opinion in Witters v. Commission for the Blind, 112 Wash.2d 363, 373, 771 P.2d 1119 (1989) (Utter, J., dissenting).

Gunwall Factors 1 and 2

Textual Language of the State Constitutional Provision

Significant Differences in Parallel Provisions of State Constitution
Combining and analyzing Gunwall factors 1 and 2, the Malyon court first examined the language of the state constitutional provision and the significant differences between its text and that of its federal counterpart. Article I, section 11 of the Washington State Constitution provides in relevant part:
Absolute freedom of conscience in all matters of religious sentiment, belief and worship, shall be guaranteed to every individual, and no one shall be molested or disturbed in person or property on account of religion; but the liberty of conscience hereby secured shall not be so construed as to excuse acts of licentiousness or justify practices inconsistent with the peace and safety of the state. No public money or property shall be appropriated for or applied to any religious worship, exercise or instruction, or the support of any religious establishment....
Const. art. I, § 11. The relevant portion of the First Amendment to the United States Constitution states: "Congress shall make no law respecting an establishment of religion...."
*290 We recognized in Malyon that "[t]he state provision explicitly prohibits appropriation or application of public money or property for four explicit purposes, religious worship, religious exercise, religious instruction, and support of any religious establishment." Malyon, 131 Wash.2d at 793, 935 P.2d 1272. We concluded, a "[p]roper analysis of article I, section 11 must distinguish similar provisions solely applicable to public schools, and concerns unique to public schools, when schools are not at issue." Malyon, 131 Wash.2d at 794, 935 P.2d 1272.
Since we are not dealing in this case with public schools under article IX, we must look further to the principles contemplated in article I, section 11. While significant textual differences are apparent, and the language of article I, section 11 considerably more specific, a commonality of principles exists in both the state and federal provisions. This common principle ensures a separation between government (and public funds) and religion and religious worship, exercise, or instruction. Both state and federal provisions ensure this separation by focusing on the statute or law enacted.
The specific language of article I, section 11, that "[n]o public money or property shall be appropriated for or applied to any religious worship, exercise or instruction, or the support of any religious establishment" was analyzed in Malyon.
The verb "appropriated" means "[t]o prescribe a particular use for particular moneys; to designate or destine a fund or property for a distinct use ...." BLACK'S LAW DICTIONARY 101 (6th ed.1990). Similarly, "applied" generally means "to use or employ for a particular purpose; to appropriate and devote to a particular use, object, demand, or subject matter." Id. at 99. In this text the terms require one to determine whether our government has purposefully transferred, or made available, money or property for the defined objective. Ultimate utilization of the money or property is a necessary but insufficient part of the constitutional test; a religious purpose is the key.
Malyon, 131 Wash.2d at 799, 935 P.2d 1272. We stated, "the appropriation of money, or application of property, to effectuate any objective other than religious worship, exercise, instruction, or religious establishment is not within the prohibition." Malyon, 131 Wash.2d at 799-800, 935 P.2d 1272. We concluded the proper focus under article I, section 11 is whether the program at issue has a religious purpose.
The program at issue in this case does not have a religious purpose. The EOG Program was created by the Legislature "as a demonstration project to serve placebound financially needy students by assisting them to obtain a baccalaureate degree at public and private institutions of higher education which have the capacity to accommodate such students within existing educational programs and facilities." RCW 28B.101.010 (1990).
Grants may be used by eligible participants to attend any public or private college or university in the state of Washington that is accredited by an accrediting association recognized by rule of the higher education coordinating board and that has an existing unused capacity. Grants shall not be used to attend any branch campus or educational program established under chapter 28B.45 RCW. The participant shall not be eligible for a grant if it will be used for any programs that include religious worship, exercise, or instruction or to pursue a degree in theology. Each participating student may receive up to two thousand five hundred dollars per academic year, not to exceed the student's demonstrated financial need for the course of study. Resident students as defined in RCW 28B.15.012(2)(f) are not eligible for grants under this chapter.
RCW 28B.101.040 (2002). The definitions and eligibility criteria are set out in RCW 28B.101.020 (1990):
(1) For the purposes of this chapter, "placebound" means unable to relocate to complete a college program because of family or employment commitments, health concerns, monetary inability, or other similar factors.
(2) To be eligible for an educational opportunity grant, applicants must be placebound residents of the state of Washington *291 who are needy students as defined in RCW 28B.10.802(3) and who have completed the associate of arts degree or its equivalent. A placebound resident is one who may be influenced by the receipt of an enhanced student financial aid award to attend an institution that has existing unused capacity rather than attend a branch campus established pursuant to chapter 28B.45 RCW. An eligible placebound applicant is further defined as a person whose residence is located in an area served by a branch campus who, because of family or employment commitments, health concerns, monetary need, or other similar factors, would be unable to complete an upper-division course of study but for receipt of an educational opportunity grant.
The focus of the EOG Program is to aid placebound financially needy students. University programs including religious worship, exercise, or instruction or efforts by any placebound financially needy student to pursue a degree in theology are explicitly excluded from the EOG Program. No religious purpose can be found anywhere within the statutory scheme.

Gunwall Factor 3

State Constitutional and Common Law History
In Malyon, we next applied the third factor of Gunwall to analyze the state constitutional and common law history of article I, section 11.
The driving concern of the state constitutional convention was religious influence in, and control over, public education. The Enabling Act carried a strict requirement that the new state constitution include a stern separation of church and public education clause. As noted, the resulting state constitution contains three separate prohibitions of religious involvement in public education. By contrast the First Amendment, drafted with fresh memories of the Church of England, resulted from the distinctly different concern to prevent the establishment of a national religion and to keep the national government from interfering with the religious establishments of the several sovereign states. This difference also suggests the state constitutional clause was not intended to be identical to its federal counterpart.
Malyon, 131 Wash.2d at 794-95, 935 P.2d 1272 (footnotes omitted). While not identical, certain features are common to both.
In Witters, Justice Utter thoroughly discussed the state constitution and common law history of article I, section 11 in his dissenting opinion. Justice Utter analyzed the common and ordinary meaning of the term "religious instruction" to the drafters and ratifiers of the state constitution, in particular drawing up the Enabling Act and the Journal of the State Constitutional Convention, 1889 (Beverly Paulik Rosenow ed., 1962). Justice Utter concluded,
This evidence is considerable and leads to only one conclusion: the historic purpose of the religious instruction clause of Const. art. 1, 11 was to prevent public aid to parochial schools and to prohibit religious instruction in public primary and secondary schools.
Witters, 112 Wash.2d at 389, 771 P.2d 1119 (Utter, J., dissenting). Although drawn from Justice Utter's dissent, a thorough review of the analysis does not reveal any faults.

Gunwall Factors 4, and 6

Preexisting State Law and Matters of Particular State Interest or Local Concern
In analyzing the fourth Gunwall factor in Malyon, we determined it was a nondispositive factor and provided no guidance, reasoning this factor usually pertains to state law preexisting ratification. Malyon, 131 Wash.2d at 797, 935 P.2d 1272. Considering the constitutional and common law history included in Justice Utter's dissent discussed above, in this case the factor is equally unhelpful. Similarly, matters of state interest or local concern do not shed significant light on our inquiry, as the separation of church and state is of both federal and state concern. Malyon, 131 Wash.2d at 797, 935 P.2d 1272.

*292 Gunwall Factor 5

Structural Differences Between State and Federal Governments
The "fifth [Gunwall] factor, the differences in structure between state and federal governments, `always favors an independent state interpretation.'" Malyon, 131 Wash.2d at 797, 935 P.2d 1272 (quoting Richmond v. Thompson, 130 Wash.2d 368, 382, 922 P.2d 1343 (1996)). We noted, "[t]his factor is most valuable when the differences ... are relevant and can be articulated. Certainly factors of federalism are indicative of different considerations served by the First Amendment than by article I, section 11." Malyon, 131 Wash.2d at 797, 935 P.2d 1272.
We have stated many times the "United States Constitution is a grant of limited power authorizing the federal government to exercise only those constitutionally enumerated powers expressly delegated to it by the states, whereas our state constitution imposes limitations on the otherwise plenary power of the state to do anything not expressly forbidden by the state constitution or federal law." Gunwall, 106 Wash.2d at 66, 720 P.2d 808. The Missouri Supreme Court expressed the effect of this structural difference best, noting that state courts should recognize and enforce legislative enactments "as embodying the will of the people unless they are plainly and palpably a violation of the fundamental law of the [state] constitution." Ams. United v. Rogers, 538 S.W.2d 711, 716 (Mo.1976).
However, this difference does not mean the First Amendment principles recognized by the United States Supreme Court cannot guide our interpretation of similar state provisions. Rather, federally recognized First Amendment protections provide a "floor" below which the states may not go. That is, state provisions cannot be interpreted to provide lesser protections than the federal constitution.
We know already the EOG Program does not violate principles of separation between church and state under the First Amendment. This conclusion is evident from the United States Supreme Court's holding in Witters v. Washington Department of Services for the Blind, 474 U.S. 481, 106 S.Ct. 748, 88 L.Ed.2d 846 (1986). In her concurrence to that opinion, Justice O'Connor clarified the appropriate federal analysis of such programs:

Mueller v. Allen, 463 U.S. 388, [103 S.Ct. 3062, 77 L.Ed.2d 721] (1983), makes clear that "state programs that are wholly neutral in offering educational assistance to a class defined without reference to religion do not violate the second part of the Lemon v. Kurtzman [403 U.S. 602, 91 S.Ct. 2135, 29 L.Ed.2d 745 (1971)] test, because any aid to religion results from the private decisions of beneficiaries." Ante, at 754 (Powell, J., concurring) (footnote omitted). The aid to religion at issue here is the result of petitioner's private choice. No reasonable observer is likely to draw from the facts before us an inference that the State itself is endorsing a religious practice or belief.
Witters, 474 U.S. at 493, 106 S.Ct. 748 (O'Connor, J., concurring in part and concurring in the judgment).
While the structural differences in federal and state constitutions mean the federal analysis is not binding upon our state constitutional analysis, it can still guide us because both recognize similar constitutional principles. The structural differences in state and federal constitutions may require a different analytical approach. That does not mean, however, that our result will always be inconsistent with the United States Supreme Court.
The state constitutional decisions of other state courts may also be helpful under the fifth Gunwall factor. These cases provide useful guidance when interpreting our state constitutional provisions because other states often face the same constitutional concerns. These cases may also clarify our analysis because they occur in a state constitutional setting.
In Americans United v. Rogers,[4] the Missouri Supreme Court was faced with a constitutional challenge to a financial assistance *293 program providing tuition grants to college students at certain approved public and private colleges. The trial court had declared the program unconstitutional under both the First Amendment to the United States Constitution and the establishment clauses of the Missouri Constitution.
In its review, the Missouri Supreme Court noted that provisions of the state constitution had previously been construed as "more `restrictive' than the First Amendment ... in prohibiting expenditures of public funds in a manner tending to erode an absolute separation of church and state." Ams. United, 538 S.W.2d at 720. The court located this heightened restriction in two provisions of the Missouri state constitution. The first, article I, section 7 of the Missouri Constitution, states:
That no money shall ever be taken from the public treasury, directory or indirectly, in aid of any church, sect or denomination of religion, or in aid of any priest, preacher, minister or teacher thereof, as such; and that no preference shall be given to nor any discrimination made against any church, sect or creed of religion, or any form of religious faith or worship.
The second, article IX, section 8 of the Missouri Constitution, provides:
Neither the general assembly, nor any county, city, town, township, school district or other municipal corporation, shall ever make an appropriation or pay from any public fund whatever, anything in aid of any religious creed, church or sectarian purpose, or to help to support or sustain any private or public school, academy, seminary, college, university, or other institution of learning controlled by any religious creed, church or sectarian denomination whatever....
Proponents of the state program for tuition assistance argued the language of the program was clear and explicit in providing that the program was designed and implemented for the benefit of the students, not of the institutions, and that the awards were made to the students, not the institutions. Ams. United, 538 S.W.2d at 720 (quoting oral argument transcript). The Missouri Supreme Court agreed, holding "those schools statutorily qualified would not be subjected to that `control' prohibited by Article IX, § 8, of the Missouri Constitution. Furthermore, the qualifications include approval by accrediting groups which condition approval on academic freedom." Ams. United, 538 S.W.2d at 721. Although the Missouri Constitution was more restrictive than the First Amendment, the court nevertheless held the program had a primary effect other than the advancement of religion and, therefore, did not violate federal or state constitutional requirements of separation of church and state. Ams. United, 538 S.W.2d at 721.
The EOG Program at issue in this case contains the same important limiting factors. Any grants awarded are based upon individual student eligibility. The students must meet the qualifying criteria before receiving grant moneys. The prohibitions of Washington State Constitution article I, section 11 that "[n]o public money or property shall be appropriated for or applied to any religious worship, exercise or instruction, or the support of any religious establishment" are not violated by the EOG Program, which confers a public benefit to eligible students to pursue a college education.
The Nebraska Supreme Court reviewed a similar challenge to a scholarship award program in Lenstrom v. Thone, 209 Neb. 783, 311 N.W.2d 884 (1981). In that case, the trial court had declared a program, similar to the EOG Program at issue here, violated the state constitution. The Nebraska program provided financial assistance to eligible college students and allowed grant moneys to be applied to educational services at private colleges. The Nebraska Supreme Court held the program did not violate the Nebraska Constitution, article VII, section 11, providing, "[n]otwithstanding any other provision in the Constitution, appropriation of public funds shall not be made to any school or institution of learning not owned or exclusively controlled by the state or a political subdivision thereof" The critical factor, the Nebraska Supreme Court held, was that the purpose of the program, and therefore the purpose of the appropriation of public funds, was to benefit eligible students to attend the *294 colleges of their choice. Lenstrom, 209 Neb. at 791, 311 N.W.2d 884.
Similar to Nebraska's constitution, our state constitution contains no specific prohibition against a program designed to benefit eligible students in pursuing college educations. Article I, section 11 of the Washington Constitution prohibits public money or property appropriated for or applied to any religious worship, exercise or instruction, or the support of any religious establishment. This prohibition is not violated by the EOG Program, which confers a public benefit to eligible students to pursue a college education. Where an appropriation has not been made for a religious purpose, it does not conflict with the Washington constitutional prohibition.
Lastly, the Minnesota Court of Appeals upheld a challenge to a post secondary enrollment options program providing tuition aid to eligible students enrolled in participating private colleges in Federation of Teachers v. Mammenga, 500 N.W.2d 136 (Minn.Ct. App.1993). Under the program, a college or university could be reimbursed only for nonsectarian courses attended by eligible students. The trial court found the program constitutional. The Minnesota Court of Appeals agreed and held the program did not violate the establishment clauses to the Minnesota Constitution. Fed'n of Teachers, 500 N.W.2d at 138-39.
The establishment clauses of the Minnesota Constitution, article I, section 16 and article XIII, section 2, contain provisions prohibiting both benefits and support to schools teaching distinctive religious doctrines. Article XIII, section 2 specifically states:
In no case shall any public money or property be appropriated or used for the support of schools wherein the distinctive doctrines, creeds or tenets of any particular Christian or other religious sect are promulgated or taught.
The Minnesota Court of Appeals determined state benefits under the program were limited to nonsectarian purposes because the program was designed to benefit students, not private colleges; eligible students could attend either public or private universities and colleges; and the state could only reimburse these institutions for nonsectarian classes. Fed'n of Teachers, 500 N.W.2d at 139.
Our state EOG Program has restrictions similar to Minnesota's, as thoroughly discussed by Justice Madsen in the majority opinion. These restrictions include: (1) students must adhere to the EOG Program's religious exclusion; (2) students must sign an agreement containing a statement of understanding that the college may not require the student to be enrolled in any program including religious worship, exercise, or instruction; (3) colleges must agree to the same prohibition against requiring religious worship, exercise, or instruction; and (4) aid is distributed to the student not to the college. The restrictions the EOG Program places on aid to students prevent the aid from being applied to any religious worship, exercise or instruction, or the support of any religious establishment.
Other states, when interpreting their "more restrictive" state constitutions, have looked to the principles underlying their state constitutional provisions.[5] The distinctions these states have drawn are similar to those we have recognized in Malyon and our other decisions. That is, where the legislature establishes a program providing benefits to eligible students for a college education, the state constitution is not violated when the student chooses to receive his or her education at a private college or university, particularly when specific conditions and restrictions have been imposed on the program and the student's course of study to prevent sectarian influence.
Under the analysis applied in other state decisions, the EOG Program would not violate the more specific separation of the church and state provisions in those state's constitutions. Nor does the EOG Program violate article I, section 11 of the Washington Constitution. Our state constitution contains *295 no express prohibition against the Legislature's establishment of a program designed to assist eligible students pursuing college educations by providing tuition reimbursement. In fact, given the importance of this education, such programs should be applauded and not condemned.
Justice Madsen correctly analyzes the principles our cases have recognized and rightly concludes no state constitutional violation exists. That an independent state constitutional analysis is consistent with the result we would have reached under the First amendment is not remarkable or unexpected. Parallel provisions often result in consistent results because the principle that church and state must remain separate is deeply ingrained in our constitutional jurisprudence. This principle animates both the First Amendment to the United States Constitution and article I, section 11 of the Washington Constitution. The restrictions guarding against an establishment of state sponsored religion have been created to protect religion's free exercise, not to prevent it.
JOHNSON and SANDERS, JJ., concur.
CHAMBERS, J. (dissenting).
I respectfully dissent. No issue is more fundamental to American liberty than freedom of religion. This freedom requires separation of church and state. Our nation's founders cherished religious independence. A core pragmatism underlies our Constitutions' safeguards of religious liberties: our founders were wise enough to know if they imposed their religious beliefs onto others, one day, religious beliefs of others could be imposed upon them.
Freedom from government interference, an essential component of the protection of religious liberty, can be guaranteed only by imposing absolute neutrality in religious matters upon the State. As Thomas Jefferson eloquently insisted, "to compel a man to furnish contributions of money for the propagation of opinions which he disbelieves ... is sinful and tyrannical."[1] In 1789, the founders of the United States were content with the establishment and free exercise clauses of the First Amendment, which command that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." They left to the several states to answer vital questions about established churches and religious freedom.
One hundred years later, the drafters of the Washington State Constitution met. They were not content with simply mirroring the First Amendment. Specifically, the events of the intervening century caused them deep concern about religion in public schools.[2] The result is that our state constitution strictly prohibits both "sectarian"[3] influence on state schools and state funds going to support religious schools. They crafted this language:
All schools maintained or supported wholly or in part by the public funds shall be forever free from sectarian control or influence.
Wash. Const. art. IX, § 4. This constitutional provision goes beyond the Enabling Act for statehood, which merely required us to establish and maintain "`a system of public schools, which shall be open to all children... and free from sectarian control.'"[4] We also went beyond the Enabling Act and the First Amendment by prohibiting influence on any school supported "wholly or in part" by state funds. Wash. Const. art. IX, § 4. Our State has, from our very beginning, been *296 far more careful than our nation to keep the spheres of religion and state separate.[5]
This overriding protectiveness of the separation of church and state was and is not limited to education. Our state constitution also goes further than the federal establishment clause, by providing:
No public money or property shall be appropriated for or applied to any religious worship, exercise or instruction, or the support of any religious establishment....
Wash. Const. art. I, § 11. We are not merely prohibited from establishing a state church; we are also prohibited from using public money or property to support worship, exercise, instruction, or religious establishments.
The majority finds comfort in a finding below that none of the institutions in question teach the tenets of any particular denomination or sect as part of their regular curriculum. Our inquiry should not end there. We must look beyond the regular curriculum to determine if public money is being "applied to any religious worship, exercise or instruction, or the support of any religious establishment." Wash. Const. art. I, § 11.
The findings below, and the trial court's determination that the program violated the state constitution, should cause us great concern. A survey of the findings below with respect to five of the colleges and universities eligible for the Educational Opportunity Grant (EOG) Program, chapter 28B.101 RCW, illustrate the need for constitutional diligence. All five of these institutions provide a valuable contribution to our society; it is not the merit as institutions that we examine, but whether our state constitution permits the application of public money to these institutions.
Northwest College. Northwest College is an institution of the Assemblies of God. Northwest College requires students to take the following courses in order to graduate: Exploring the Bible, Foundations of the Christian Life, Evangelism in the Christian Life, and Christian Doctrine. The college's mission statement includes, "Help to fulfill the Great Commission and to propagate the historic faith of the sponsoring church." Clerk's Papers (CP) at 1126. Chapel at Northwest College is held daily and attendance by all students is required.
Walla Walla College. Walla Walla College is governed by a board of trustees, all of whom must be members in good standing of the Seventh-Day Adventist Church. Students are required to take 16 hours in religion and theology to graduate. Approximately 90 percent of the full-time faculty members of Walla Walla College are members in good and regular standing of the Seventh-Day Adventist Church. The Walla Walla College student handbook provides:
Observing the seventh day of the week as a day of rest from daily activities is a practice of the Seventh-Day Adventist Church and a distinctive part of life at Walla Walla College. All students are expected to respect that observance by refraining from ordinary activities, attending Friday evening and Sabbath services, and treating the day with special respect in keeping with the ethos of this academic community.
CP at 1220.
Faculty and students are encouraged to offer Christian prayer in classes.
CP at 1221.
Students at Walla Walla College are not allowed to ... undermine the religious ideals of the College.
CP at 1221.
Pacific Lutheran University. Pacific Lutheran University is controlled by the Evangelical Lutheran Church in America. Graduating students must have taken eight hours of religious courses. Faculty shall "set a worthy example of Christian life and seek to inculcate in the students the highest ideals of *297 Christian manhood and womanhood." CP at 1143.
Seattle Pacific University. Seattle Pacific University is a Free Methodist Church institution. "All members of the [governing] Board are to be in sympathy and accord with the doctrinal position and standards of the University as a Free Methodist school." CP at 1170. Students are required to take 15 credit hours of religion to graduate, and among those credit hours a student must take Christian Formation, Christian Scriptures, and Christian Theology. The faculty handbook describes "effective teaching" to include "[k]nowledge of and ability to communicate the relationship between one's discipline and Christian faith and life and willingness to guide and mentor in matters of spiritual formation." CP at 1175-76. The faculty handbook also sets forth that service to the church is a significant factor in evaluating a faculty member's application for tenure.
Whitworth College. Two-thirds of the governing board of Whitworth College must be members of the Synod of Alaska-Northwest of the Presbyterian Church and between one-sixth and one-third of the members are to be ordained Presbyterian ministers. There are three core religious courses all students must take to satisfy graduation requirements. The Whitworth College mission statement states, "[i]t is policy or at least a `cultural expectation' at Whitworth to encourage the integration of faith and learning in the classroom.... Whitworth also engages in efforts to use the transforming power of Jesus Christ to transform lives of students in response to student requests." CP at 1240. Ministry coordinators appear to be hired by the school and are directed to "motivate and empower students to minister to one another." CP at 1241. In the residence halls, students are paid to act as ministry coordinators.
Our founders sought to guarantee each of us the right to choose our own religious path. They understood that, once having chosen, many of us would believe that our path should be the path for others. Indeed, many religious faiths encourage believers to win over converts. Education, by its essential nature, affords those who teach access to minds that are often eager and willing to learn and accept what is taught. The State cannot constitutionally induce principles, beliefs and thoughts of a devotional nature, and cannot pay others to do so. The institutions before us provide a great public and humanitarian service. But once public funds are provided to an educational institution controlled by a religious organization with a religious mission, functionally, do those funds advance religious doctrine? Our founders chose not to take a chance that they might.
The founders did not intend, nor has this Court ever permitted, public educational funds be entrusted to those who teach or those who receive religious instruction. The EOG Program relies solely upon statements signed by the schools and students, including the five institutions surveyed above, to meet the constitutional requirements. Those statements merely assert the grant recipient is not enrolled in a program that includes religious worship, exercise, or instruction or pursuing a religious, seminarian or theological degree; there is no other enforcement mechanism. Given that each of the institutions surveyed above is controlled or significantly influenced by a religious organization and requires courses in religion as a prerequisite for graduation, it is likely that the students, colleges, and universities are interpreting "religious instruction" as meaning "religious instruction in preparation for the ministry." That is not all that our state constitution forbids.
Recognizing our state constitution's unique treatment of education and religion, this Court has developed two different analytical approaches to resolve challenges of alleged support of religion by the State. Compare State Higher Educ. Assistance Auth. v. Graham, 84 Wash.2d 813, 529 P.2d 1051 (1974) (prohibiting loans to students attending sectarian institutes for violating state constitution), with Malyon v. Pierce County, 131 Wash.2d 779, 935 P.2d 1272 (1997) (permitting expenditure of county funds on local law enforcement chaplaincy program). If the challenge involves some element of public education, we have applied a broad construction of article I, section 11 and article IX, *298 section 4. See, e.g., Graham, 84 Wash.2d 813, 529 P.2d 1051; Weiss v. Bruno, 82 Wash.2d 199, 509 P.2d 973 (1973) (forbidding expenditure of state funds to support students at sectarian institutions); Calvary Bible Presbyterian Church v. Bd. of Regents, 72 Wash.2d 912, 436 P.2d 189 (1967) (secular study of the "Bible as Literature" constitutional); Perry v. Sch. Dist. 81, 54 Wash.2d 886, 344 P.2d 1036 (1959) (invitation of students to attend outside religious instruction unconstitutional); Visser v. Nooksack Valley Sch. Dist. 506, 33 Wash.2d 699, 207 P.2d 198 (1949) (same); Mitchell v. Consol. Sch. Dist. 201, 17 Wash.2d 61, 135 P.2d 79 (1943) (publicly subsidized transportation to religious school unconstitutional); State ex rel. Dearle v. Frazier, 102 Wash. 369, 173 P. 35 (1918) (high school credit for outside Bible study unconstitutional).[6]
In summary, we have applied a broad construction of the provisions of article I, section 11 and article IX, section 4 in the context of education, whether or not the institutions were "schools" as otherwise intended by article IX. If, however, the challenge does not involve education, we merely determine whether the State's objective was support of "religious worship, exercise, or religious establishment." Malyon, 131 Wash.2d at 799-800, 935 P.2d 1272.
Structurally and analytically, this Court has frequently analyzed constitutional challenges involving education through both article IX and article I, section 11. We have developed a rich body of law applying article I, section 11 to education, both at the common school level and at the university level. Concluding that article IX generally does not apply to higher education does not permit us, as Justice Johnson proposes, to ignore the specific protections of article IX, section 4. Article IX, section 4 goes beyond the practical command to the Legislature to establish general and uniform common schools, but instead embodies a deep principle of Washington law: that we jealously honor and protect the separation of church and state. Even indirect support of a religious school can violate article I, section 11 and article IX, section 4. See generally Weiss, 82 Wash.2d 199, 509 P.2d 973. Unfortunately, the majority has nearly abandoned article IX, section 4 and consequently has nearly abandoned our jurisprudence demanding strict separation in matters of religion and education. In its place, the majority has substituted the antiestablishment jurisprudence of the United States Supreme Court. I fear that abandonment of article I, section 11 of the Washington Constitution in favor of the Lemon test (Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971)) has not taken merely two small steps but two giant leaps in constitutional law, first Malyon and now Gallwey.
I disagree with my learned colleague that Litchman v. Shannon, 90 Wash. 186, 155 P. 783 (1916), foredooms the majority's result here. Litchman established that the University of Washington was not a common school for the purposes of article IX, sections 1-2, and therefore could charge tuition. I have no quarrel with this conclusion. Article IX, section 4, and the deep principle it articulates, was simply not implicated.
Historically, this Court has never shied away from finding unconstitutional state support for religious worship, exercise or instruction in public schools. See, e.g., Dearle, 102 Wash. 369, 173 P. 35. In Dearle, this Court considered high school credit given for outside Bible study. Dearle, 102 Wash. 369, 173 P. 35. We found the required examination was public support for religious instruction, and thus unconstitutional. Dearle, 102 Wash. at 370, 380-85, 173 P. 35. Cogently, one Justice observed of article I, section 11:

*299 That is plain, simple and mandatory, and by it the legislature, school authorities and courts are bound. The school authorities are forbidden to apply any of the public money or property to any religious exercise or instruction. The curricula of the public educational institutions cannot be made to include any kind of religious worship, exercise, or instruction. The language is most comprehensive and argues itself.
Dearle, 102 Wash. at 386, 173 P. 35 (Holcomb, J., concurring). This program presents parallel constitutional concerns. The EOG Program functions to give public money to schools controlled by religious organizations that require or make available to the students religious worship, exercise, and instruction. This is unconstitutional in public schools, and it is unconstitutional in private schools supported by state funds, no matter how de minimis the support.
We rearticulated these principles in Mitchell. There, we considered a program similar in form to the EOG Program. Washington State provided transportation to all students, regardless of whether they attended a public, private, or religious school. Mitchell, 17 Wash.2d at 63, 135 P.2d 79. This was couched by the statute as an individual entitlement of the pupil, rather than as direct support for a sectarian school. Id. We concluded the program was public support for a religious institution and, in effect, created sectarian schools partially supported by public funds, and thus violated both article I, section 11 and article IX, section 4. Mitchell, 17 Wash.2d at 66-67, 135 P.2d 79; accord Visser, 33 Wash.2d 699, 207 P.2d 198 (transportation a benefit to religious school and violative of both article I, section 11 and article IX, section 4). We rejected the fig leaf there that the support was merely a benefit to individuals, and we should reject it here.
In Perry, this Court again made clear even de minimis use of school facilities to further religious education was forbidden by our state constitution. A school district in Spokane allowed students to spend an hour a week during the school day in off campus religious instruction sponsored by local churches. Perry, 54 Wash.2d at 889, 344 P.2d 1036. The school involvement was limited to collecting permission cards from parents and brief announcements or explanations of the program. Perry, 54 Wash.2d at 888, 344 P.2d 1036. The distribution of the cards was found to be "use of school facilities supported by public funds for the promotion of a religious program, which contravenes Art. I, § 11 of our state constitution." Perry, 54 Wash.2d at 896, 344 P.2d 1036. "This practice has the further effect of influencing the pupils, while assembled in the classrooms, as a `captive audience' to participate in a religious program, contrary to the express provisions of Art. IX, 4 of our state constitution." Perry, 54 Wash.2d at 896, 344 P.2d 1036.
We refined our analysis in Calvary Bible. There, we considered whether an undergraduate course, "English 390: The Bible as Literature," taught in a state controlled university, constituted religious instruction. Calvary Bible, 72 Wash.2d at 913, 436 P.2d 189. We concluded it did not. The trial court issued extensive findings of fact establishing, "English 390 is taught as a study of the Bible for its literary and historic qualities and is presented objectively as a part of a secular program of education" and did not promote a particular theology or indoctrinate a particular religious belief. Calvary Bible, 72 Wash.2d at 916, 436 P.2d 189. We took a hard look at the meaning of "religious instruction" as used in article I, section 11 and concluded:
[T]he framers of our constitution did not intend the word "instruction" to be construed without limit, but that the proscribed field be confined to that category of instruction that resembles worship and manifests a devotion to religion and religious principles in thought, feeling, belief, and conduct, i.e., instruction that is devotional in nature and designed to induce faith and belief in the student.
Calvary Bible, 72 Wash.2d at 919, 436 P.2d 189.
Calvary Bible was rightly decided. Rightly understood, its holding is limited to establishing a particular University of Washington "Bible as Literature" class is not "religious *300 instruction" as prohibited by our state constitution.
The majority attempts to squeeze the EOG Program within this Court's holding in Calvary Bible that the prohibition on "instruction" did not extend to every course involving religion. They give insufficient weight to the fact the University of Washington was not alleged to be controlled by any religious establishment, and do not address the remaining prohibitions against worship, exercise or support of any religious establishment of article I, section 11.
Not long after Calvary Bible, this Court was faced with a funding plan not entirely dissimilar to the EOG Program. State Higher Educ. Assistance Auth., 84 Wash.2d 813, 529 P.2d 1051. The State had established a program where loans from educational institutions to students attending college would be purchased by the State, whether the school was religious or secular. Graham, 84 Wash.2d at 815, 529 P.2d 1051. The money to support this came from a combination of general funds and a tax exempt bond. Graham, 84 Wash.2d at 815-16, 529 P.2d 1051. We found the program was support to religious institutions and therefore violated Washington Constitution article IX, section 4 and article I, section 11. We relied heavily on Weiss, which established:
"Any use of public funds that benefits schools under sectarian control or influenceregardless of whether that benefit is characterized as "indirect" or "incidental"violates this provision."
Graham, 84 Wash.2d at 817, 529 P.2d 1051 (quoting Weiss, 82 Wash.2d at 211, 509 P.2d 973). Accord Witters v. Comm. for the Blind, 112 Wash.2d 363, 771 P.2d 1119 (1989) (grant to visually handicapped student to enable him to attend a religious college in preparation for the ministry unconstitutional). Clearly, if merely purchasing a loan made to a college student is fatal support of a religious educational institution, giving a grant to a student at a sectarian educational institution is also fatal support.
Our broad construction of our constitutional prohibition of the use of public funds for any religious purpose was clear by the time we announced Perry. In recognition of the special place public education holds in our system of government, this standard remains. However, we do not apply such a strict standard in other cases. See generally Malyon 131 Wash.2d at 801, 935 P.2d 1272. Admittedly, Malyon does not fit within the doctrine laid out by our prior article I, section 11 and article IX, section 4 cases. However, critically, Malyon was not an education case, and our jurisprudence treats public schools and education different from the way it treats chaplaincy programs. Because Malyon does not implicate education, it does not provide us with guidance here. The majority suggests that my approach would necessitate barring the State from providing medical coupons redeemable at religious hospitals. I respectfully disagree. Article I, section 11 and article IX, section 4, read together do not reach the State's police power to protect the health of state residents; such programs would be analyzed solely under article I, section 11. Under Malyon, such programs would almost certainly be upheld as constitutional.
The founders of our nation and our state cherished religious independence. The founders were not hostile to religion; instead, I am of the firm conviction they believed the best way to encourage authentic religious devotion was to keep government out of religion. The drafters of our state constitution declared that schools supported by public funds shall forever be free from sectarian influence. Wash. Const. art. IX, § 4. They also declared that no public money should be applied to any religious institution or support of any religious establishment. Wash. Const. art. I, § 11. This Court has steadfastly struck down as unconstitutional direct and indirect support, on campus and off campus support, and even de minimis use of public funds which could be used by an educational program to advance a religious purpose. The EOG Program cannot withstand the restrictions imposed by our state constitution. I would affirm the trial court, and therefore I respectfully dissent.
CHAMBERS, BRIDGE and IRELAND, JJ., dissents.
NOTES
[1] The record in this case is replete with examples of "placebound" students. One such student is Mr. Richard Pacheo, a 34-year-old Heritage College student who is a part-time social and health services worker. Mr. Pacheo was considered placebound to the Toppenish area because he was caring for his blind mother and his father who is diabetic and in the early stages of Alzheimer's Disease. Ex.2040. The closest public institution for Mr. Pacheo is Central Washington University, which is a one hour and 20 minute drive from his home in an area that is described as "treacherous" in the winter. Report of Proceedings at 268-69.
[2] The HECB proposal called for the creation of several branch campuses: (1) Washington State University to operate campuses in Spokane, Tri Cities, and Vancouver; (2) the University of Washington in Tacoma; and (3) Central Washington University to serve the Yakima Valley. Clerk's Papers at 1078.
[1] 82 Wash.2d 199, 509 P.2d 973 (1973).
[2] 84 Wash.2d 813, 529 P.2d 1051 (1974).
[3] 106 Wash.2d 54, 720 P.2d 808 (1986).
[4] 538 S.W.2d 711 (Mo.1976).
[5] Contra Hartness v. Patterson, 255 S.C. 503, 179 S.E.2d 907 (1971); Synod of Dakota v. State, 2 S.D. 366, 50 N.W. 632 (1891); Miller v. Ayres, 213 Va. 251, 191 S.E.2d 261 (1972); Almond v. Day, 197 Va. 419, 89 S.E.2d 851 (1955).
[1] The Papers of Thomas Jefferson 545 (Julian P. Boyd ed., 1950) (footnote omitted).
[2] See generally Katie Hosford, The Search for a Distinct ReligiousLiberty Jurisprudence under the Washington State Constitution, 75 Wash. L.Rev. 643, 649-51 (2000); see also Betty Parkany, "Religious Instruction" in the Washington Constitution 6, 12-13 (1965) (Delegates to the constitutional convention were concerned about sectarian influence in public schools).
[3] "Of or relating to a particular religious sect." Black's Law Dictionary 1356 (7th ed.1999).
[4] Robert F. Utter & Edward J. Larson, Church and State on the Frontier: The History of the Establishment Clauses in the Washington State Constitution, 15 Hastings Const. L.Q. 451, 458 (1988) (quoting Enabling Act, ch. 180, § 4, 25 Stat. 676-77 (1889)).
[5] I applaud the majority's masterful historical survey of article IX, section 4. However, I still view article IX, section 4 as a useful tool for interpreting article I, section 11 in the context of education. When I read both constitutional provisions together, as we did in State Higher Education Assistance Authority v. Graham, 84 Wash.2d 813, 529 P.2d 1051 (1974) and impliedly did in Weiss v. Bruno, 82 Wash.2d 199, 509 P.2d 973 (1973), I reach a different conclusion.
[6] I note that the majority explicitly overrules two of this Court's established cases, Weiss v. Bruno, 82 Wash.2d 199, 509 P.2d 973 (1973) and State Higher Education Assistance Authority v. Graham, 84 Wash.2d 813, 529 P.2d 1051 (1974). The majority implicitly overrules all cases where this Court has read article I, section 11, in tandem with article IX, section 4; this reaches beyond Weiss and Graham to State ex rel. Dearle v. Frazier, 102 Wash. 369, 173 P. 35 (1918); Mitchell v. Consolidated School District 201, 17 Wash.2d 61, 135 P.2d 79 (1943); Visser v. Nooksack Valley School District, 33 Wash.2d 699, 207 P.2d 198 (1949); Perry v. School District 81, 54 Wash.2d 886, 344 P.2d 1036 (1959); and Calvary Bible Presbyterian Church v. Board of Regents, 72 Wash.2d 912, 436 P.2d 189 (1967). All read the two provisions of our state constitution together.